No. 52,646

Mesa Petroleum Company, *Appellant,* v. The Kansas Power and Light Company, *Appellee.*

(629 P.2d 190)

Opinion filed June 10, 1981.

*Richard C. Byrd,* of Anderson, Byrd & Richeson, of Ottawa, argued the cause, and *Walker A. Hendrix,* of the same firm, *E. F. Russell,* of Ulysses, and *Barry Cannaday,* of Amarillo, Texas, were with him on the briefs for the appellant.

*Jerome T. Wolf,* of Spencer, Fane, Britt & Browne, of Kansas City, Missouri, argued the cause, and *Basil W. Kelsey* and *Terry W. Schackmann,* of the same firm, *Gene H. Sharp,* of Vance, Hobble, Neubauer, Nordling, Sharp & McQueen, P.A., of Liberal, *David S. Black,* of Topeka, and *James L. Grimes, Jr.,* of Cosgrove, Webb & Oman, of Topeka, were with him on the briefs for the appellee.

The opinion of the court was delivered by

Fromme, J.: Mesa Petroleum Company (Mesa) filed this action for a declaratory judgment asking the trial court to determine that it legally terminated a gas supply contract with the defendant, The Kansas Power and Light Company (KP&L). The question of whether the contract was legally terminated depends on an interpretation of Section 105 (b) (1) of the Natural Gas Policy Act of 1978 (N.G.P. Act), 15 U.S.C. § 3315 (b) (1) (1979), and an interpretation of the terms of the gas supply contract of the parties which contract contained an indefinite price escalator clause.

A large number of the existing contracts providing for the sale of gas contain what are referred to as price escalator clauses of one kind or another which permit upward price adjustments during the term of the contract. These upward price adjustments do not provide for fixed or definite price increments and frequently are not tied to a specific schedule but are "triggered" by other occurrences, such as an increase in government-regulated prices.

Some background of the N.G.P. Act will be helpful in understanding the questions here involved. The N.G.P. Act was

adopted November 9, 1978, and became effective December 1, 1978. It mandated a new legislative framework for deregulation of the natural gas industry. It established a comprehensive scheme of statutorily prescribed maximum ceiling prices applicable to separate, distinct types of "first sales" of natural gas occurring in both interstate and intrastate commerce. In many respects this new law limited, replaced or superseded the controls and regulations existing under the previous controlling federal statute, The Natural Gas Act, 15 U.S.C. § 717 *et seq.* (1976). The N.G.P. Act terminated the authority of the Federal Energy Regulatory Commission (FERC) to prescribe area rates for natural gas under the Natural Gas Act, as FERC and its predecessor agencies had done for years. See 15 U.S.C. § 3431 (1979).

In contrast to the Natural Gas Act, the N.G.P. Act has for its purpose the deregulation of natural gas prices and the establishment of a maximum pricing system designed to phase in higher gas prices gradually over a six-year period, ultimately achieving substantial deregulation of gas prices in the year 1985. See 15 U.S.C. § 3331 (1979); *State of Okl., Etc. v. Federal Energy Reg. Com'n,* 494 F. Supp. 636 (W.D. Okla. 1980). Both the terms of the new statute and its legislative history demonstrate that the prices prescribed in Title I of the N.G.P. Act are ceiling prices. Contractual provisions governing the purchase and sale of natural gas are not superseded or nullified unless they should provide for price escalation in excess of the statutory ceilings. FERC Order No. 23, 44 Fed. Reg. 16895 (1979). The maximum lawful price under the N.G.P. Act was set as the lower of the price under the terms of any existing contract, to which such natural gas was subject on November 9, 1978, as such contract was in effect on such date, or the maximum lawful price for the appropriate vintage of gas as set by the N.G.P. Act. The maximum lawful prices for new natural gas are set as provided in 15 U.S.C. § 3312 (1979), and are generally referred to as Section 102 prices. The maximum lawful prices for old natural gas are set as provided in 15 U.S.C. § 3319 (1979) and are generally referred to as Section 109 prices. Sections 102 and 109 refer to sections of the N.G.P. Act. Sections 3312 and 3319 refer to sections under title 15 U.S.C.

We now turn to the facts of the present case which were stipulated to by the parties.

On May 28, 1970, Mesa and KP&L entered into a contract for

the intrastate sale of natural gas from the Chase Group Formation and the Council Grove Formation in the Hugoton Gas Field in Kansas. In 1976, Mesa made plans to build and operate a new cryogenic nitrogen rejection plant to extract ethane and other liquids that were reserved under the contract. The question of Mesa's right to extract additional liquids from the natural gas stream was the subject of a lawsuit between Mesa and KP&L in the District Court of Grant County. The district court held that Mesa had reserved the right to extract ethane under the contract. The extraction would have resulted in a stipulated twenty-two percent (22%) reduction in natural gas to be received by KP&L.

In exchange for Mesa not building the cryogenic plant and thus saving the twenty-two percent of the natural gas under the contract, KP&L entered into the supplemental contract with Mesa which is now under consideration. The supplemental contract was dated February 25, 1976. It provided that the natural gas would be sold at prices which escalated over the life of the contract.

The original price for the twenty-two percent of natural gas was $1.52 per mcf on February 25, 1976. The price escalated to $1.54 on April 1, 1977, as a result of a two cent annual fixed price escalation under Article I (a). The price was redetermined to $1.92 on April 1, 1978, pursuant to Article I (d) of the contract, which provides a procedure for redetermining the price based on prices in Kansas, Oklahoma, New Mexico and the Texas Panhandle and other factors.

The price of the remaining seventy-eight percent of natural gas continued to be governed by the 1970 contract. The current price for the seventy-eight percent of natural gas is 24.46 cents per mcf. This price is limited to a fixed two cent escalation every five years. We are not concerned with the 1970 contract.

Article I (b) of the supplemental contract provided for escalation of the price of the twenty-two percent of natural gas in the event a governmental authority prescribed a higher price. Article I (b) stated:

"(b) *Governmental Price Regulations: If* the Federal Power Commission or *any successor governmental authority,* or any Kansas regulatory or governmental authority, having jurisdiction in the premises *shall* at any time hereafter *prescribe by law,* rate proceeding, rulemaking procedure or a comparable procedure *any price applicable to any natural gas* of any vintage produced from the Hugoton-Anadarko area and *sold intrastate* in Kansas or in interstate commerce, *which is*

*higher than the price* or prices then *provided in Article I* to be paid for New Gas delivered hereunder, *then the price to be paid for New Gas remaining to be sold hereunder shall be increased to equal such regulated price.* In that event, *the increased price shall become effective* as of *the date of action of the governmental* or regulatory *authority* establishing the regulated price, *or its effective date, whichever is later* (subject to the provisions of paragraph (e) below), and shall remain in effect until later changed in accordance with the pricing provisions of this Agreement." Emphasis supplied.

On November 9, 1978, the N.G.P. Act was enacted. It prescribed certain maximum or ceiling prices for separate, distinct categories of natural gas. Section 105 of the Act established the maximum price to be paid under an intrastate contract for new gas. Section 105 of the Act provides:

"(a) **Application**

*The maximum lawful price* computed under subsection (b) of this section *shall apply* to any first sale of natural gas delivered during any month in the case of natural gas, sold under any existing contract or any successor to an existing contract, which was not committed or dedicated to interstate commerce *on November 8, 1978.*

"(b) **Maximum lawful price**

"(1) General rule

Subject to paragraphs (2) and (3), the *maximum lawful price* under this section *shall be the lower of —*

"(A) *the price under the terms of the existing contract, to which such natural gas was subject on November 9, 1978,* as such contract was in effect on such date; *or*

"(B) *the maximum lawful price,* per million Btu's, computed for such month *under section 3312* of this title (relating to new natural gas).

. . . .

"(c) **Definition of contract price**

For purposes of this section, the term 'contract price', when used with respect to any specific date, means —

"(1) the price paid, per million Btu's, under a contract for deliveries of natural gas occurring on such date; or

"(2) if no deliveries of natural gas occurred under such contract on such date, the price, per million Btu's, that would have been paid had such deliveries occurred on such date." Emphasis supplied.

The Section 102 price for the month of December, 1978, was $2.078 per million Btu's as compared to the preexisting price of $1.92 being paid under the supplemental contract.

On November 22, 1978, Mesa informed KP&L by letter that the price under the supplemental contract would escalate as a result of the N.G.P. Act to $2.078 per million Btu's for the month of

December, 1978. The N.G.P. Act maximum ceiling prices became effective on December 1, 1978.

In accordance with Article I (e) of the supplemental contract, KP&L filed an application with the Kansas Corporation Commission (KCC) on December 7, 1978, for the purpose of seeking permission to include the increased price requested by Mesa in its cost of purchased gas. Article I (e) (of the supplemental contract) provided:

"(e) *KCC Action:* KPL shall have no obligation to pay any increase in prices pursuant to provisions for escalation (paragraph (a) above), governmental price regulation (paragraph (b) above), deregulation (paragraph (c) above), price redetermination (paragraph (d) above), or infill drilling (Article III, paragraph (d) below), until the effective date of the pass-on thereof as authorized by the Kansas Corporation Commission ("KCC"), except as hereinafter provided.

"KPL shall make application to the KCC for approval of the pass-on of any such increased costs of gas not later than 60 days prior to the date the applicable increase is scheduled to become effective, or within five days after the increase has been established by arbitration or by action of governmental or regulatory authorities. The failure of the KCC to approve a pass-on within 60 days after application by KPL shall be deemed a rejection of the price increase for the purposes of this Agreement.

"KPL shall have the option, to be exercised by written notice to Mesa not later than 15 days after the KCC shall have rejected any such pass-on, to pay the increased price and in such event the provisions of this Agreement shall remain in effect. If KPL does not elect to pay such increase then Mesa shall have the option (to be exercised by written notice delivered to KPL not later than 30 days after the KCC shall have rejected any such pass-on by KPL) either (i) to terminate this Agreement insofar as it provides for the sale of New Gas to KPL hereunder, or (ii) to continue to receive the price being paid by KPL without giving effect to the increase; provided that the pricing provisions of this Agreement shall continue to be applicable thereafter regardless of Mesa's election to continue receiving such price."

Article I (e) also provided that if the KCC did not approve KP&L's request within sixty (60) days, the increased price was considered to be rejected. In the event of the KCC's failure to approve the increased price, KP&L had the option under the supplemental contract to pay the price requested by Mesa without KCC authorization. If KP&L refused to pay, Mesa had the option to terminate the contract.

On February 2, 1979, prior to the expiration of the KCC's sixty-day approval period, KP&L filed a supplemental application. The KCC did not act on the application or the supplemental application within the sixty-day approval period. The sixty-day period ended February 5, 1979. KP&L did not elect to pay the

increased price requested by Mesa. Mesa informed KP&L by letter on February 15, 1979, that Mesa was electing to exercise its option to terminate the supplemental contract. On February 16, 1979, Mesa filed the present suit in the Grant County District Court seeking a declaratory judgment to determine that it properly terminated the supplemental contract.

The district court entered its judgment in this case and ruled that Article I (b) of the supplemental contract was clear and unambiguous and reflected an intent on the part of Mesa and KP&L to establish the maximum price allowed by the federal government through activation of the escalator clause in their contract. The court also concluded that Congress was a governmental authority that could succeed to the rate-making function of the Federal Power Commission within the meaning of Article I (b) of the contract.

However, the court further concluded under Article I (b) of the supplemental contract the price was not escalated under the terms of the escalator clause, and the correct maximum lawful price set by Section 105 (b) (1) of the N.G.P. Act was the price under the terms of the existing contract on November 9, 1978, and not the Section 102 price as contended by Mesa. The plaintiff's prayer for a declaratory judgment was denied and it was determined that the supplemental contract entered into by the parties remained in full force and effect.

The single question raised in this appeal is whether the indefinite price escalator clause in the supplemental contract was triggered under Section 105 (b) (1) of the N.G.P. Act thus increasing the price to be paid under the intrastate contract to the Section 102 price. If the price was increased to the Section 102 price, Mesa was justified in terminating the supplemental contract and was entitled to the declaratory judgment. If the indefinite price escalator clause in the supplemental contract was not triggered under the N.G.P. Act the former contract price of $1.92 continued, and termination by Mesa was improper.

The provision of the N.G.P. Act which coordinates the transition from pricing under the Natural Gas Act to deregulation by maximum ceiling prices under the N.G.P. Act of 1978 is found in Section 601. 15 U.S.C. § 3431 (1979). With regard to the Natural Gas Act and the FERC, Section 601 of the N.G.P. Act states as follows:

"[E]ffective on the first day of the first month beginning after November 9, 1978, [December 1, 1978] the provisions of the Natural Gas Act and the jurisdiction of the Commission [FERC] under such Act shall not apply to natural gas which was not committed or dedicated to interstate commerce as of November 8, 1978, solely by reason of any first sale of such natural gas."

Therefore, it appears that the old regulated prices were to continue under the Natural Gas Act up until December 1, 1978. On December 1, 1978, the new N.G.P. Act was to take over and the higher maximum ceiling prices on separate and distinct types of gas being produced would become the maximum possible ceiling prices.

Now let us examine the terms of Article I (b), the indefinite price escalator clause of the supplemental contract. It refers to any successor governmental authority which shall prescribe by law any price applicable to any natural gas sold in Kansas. Under the N.G.P. Act the FERC could no longer regulate the price of gas. Maximum prices were thereafter set by law for separate, distinct types of gas. The gas under the supplemental contract was being sold intrastate in Kansas. The gas prices had been depressed under federal and state regulation. It is reasonable to assume that the parties intended if Congress increased the maximum prices for which gas might be sold that this would fulfill the reference in Article I (b) to action by any successor governmental authority.

However, although the contract does say if the price prescribed by law is higher than the price then provided in Article I of the contract the price shall escalate to the regulated price, in the final sentence of Article I (b) it clearly states when the price is to be escalated under the contract. The escalation shall be either on the date the action of the governmental authority was taken (November 9, 1978), or the effective date of the law (December 1, 1978), *whichever is later.* Therefore, the price under the supplemental contract was to remain $1.92 per mcf until December 1, 1978.

We now turn to Section 105 (b) (1) of the N.G.P. Act which sets forth the method and procedure to determine the maximum lawful price allowed. It states the maximum lawful price under the section *shall be the lower of* — (A) the price under the terms of the existing contract to which the gas was subject on November 9, 1978, or (B) the maximum lawful price under Section 102 of the N.G.P. Act. The maximum lawful price under Section 105 (b) (1)

was either the price under the terms of the existing contract on November 9, 1978 ($1.92 per mcf), or the maximum price under Section 102 of the N.G.P. Act for the month of December, 1978 ($2.078 per million Btu's), whichever is lower. Clearly the contract price on November 9, 1978, is the lower and remained the maximum lawful price under Section 105 (b) (1).

In its final brief filed in the district court Mesa argued the indefinite escalator clause was triggered by the payment of higher prices, not the enactment of the N.G.P. Act on November 9, 1978. In other words, the higher maximum prices were without doubt paid by some other purchasers and this triggered the raise to the price under Section 102 of the N.G.P. Act. We find nothing in the contract to support such an argument.

Mesa also argues the intention of the parties, when the indefinite escalator clause was inserted in the contract, was to provide the "highest price allowed by law." If that was so it could have been easily and clearly so written in place of the terms now appearing in the contract. Mesa seems to discount or overlook the statutory language as it applies to the specific language of the indefinite escalator clause in the supplemental contract. The contract by its terms does not provide for price escalation upon enactment of the N.G.P. Act on November 9, but only on December 1. Price escalation on December 1, however, is no escalation at all for the maximum ceiling price can only rise to the lower of the two prices. The contract price on November 9 was the lower at $1.92 per mcf.

Since the indefinite price escalator clause in the contract was not triggered by the N.G.P. Act the attempted termination of the supplemental contract by Mesa was not lawful and Mesa remains bound by the terms of that contract.

KP&L in defense of its position has briefed and argued additional reasons for holding that the price of gas under the contract could not escalate to the Section 102 prices. Mesa in response and KP&L in defense of the lower court judgment have briefed further matters. These need not be addressed. What has been said disposes of this appeal.

The judgment of the district court is affirmed.