No. 52,677

Energy Reserves Group, Inc., *Appellant,* v. Kansas Power and Light Company, *Appellee.*

(630 P.2d 1142)

Opinion filed July 17, 1981.

*Gary W. Davis,* of Martin, Pringle, Fair, Davis & Oliver, of Wichita, argued the cause, and *Martin W. Bauer,* of the same firm, and *Clark Mandigo,* general counsel for Energy Reserves Group, Inc., were with him on the brief for the appellant.

*Jerome T. Wolf,* of Spencer, Fane, Britt & Browne, of Kansas City, Missouri, argued the cause, and *Basil W. Kelsey* and *Terry W. Schackmann,* of the same firm, *David S. Black,* general counsel, for the Kansas Power and Light Company,

and *William C. Farmer,* of Smith, Shay, Farmer & Wetta, of Wichita, were with him on the brief for the appellee.

*Brian J. Moline,* general counsel, and *Terence L. Mundorf,* assistant general counsel, were on the brief *amicus curiae* for the State Corporation Commission of the State of Kansas.

*Robert L. Howard,* of Foulston, Siefkin, Powers & Eberhardt of Wichita, was on the brief *amicus curiae* for Kansas Independent Oil and Gas Association.

The opinion of the court was delivered by

MILLER, J.: This is a declaratory judgment action involving the construction of the terms of two natural gas purchase contracts in the light of certain federal and state statutes.

The plaintiff, Energy Reserves Group (ERG), brought suit against the defendant, Kansas Power & Light Company (KPL), seeking judgment that ERG had the right to terminate the contracts. KPL, by counterclaim, sought judgment that it had committed no breach, and that ERG had no right to terminate the contracts. Upon an extensive documentary record, both parties moved for summary judgment. The trial court denied ERG's motion and granted that of KPL; ERG appeals.

The two gas purchase contracts in issue were executed on September 27, 1975, by Clinton Oil Company, predecessor of ERG, and KPL. One was a contract for the sale of gas produced directly from the wells; the other was a residue gas purchase contract for the sale of remaining gas after certain recovery and processing steps were completed. Under the contracts, KPL agreed to purchase natural gas for the life of the Spivey-Grabbs field, located in Harper and Kingman counties, or for the life of the processing plants associated with the field. All the gas involved was produced and sold within the State of Kansas and thus was intrastate gas.

Each contract contains identical provisions relating to government price escalation, price redetermination, commission approval, and intent. These contract provisions are as follows:

## The Government Price Escalator Clause

"6.7 If any federal or Kansas regulatory or governmental authority having jurisdiction in the premises shall at any time hereafter fix a price per MCF applicable to any natural gas of any vintage produced in Kansas, higher than the contract price then in effect under this gas contract, the price to be paid for gas thereafter shall be increased to equal such regulated price. In that event, the increased price shall be effective as of the date of action of the governmental or

regulatory authority establishing the regulated price, or its effective date, which-
ever is later, subject to the provisions of Section 8 hereof."

## Price Redetermination

"7.1 SELLER shall have the option to cause the price being paid for its gas by
BUYER to be redetermined every two years, beginning in 1977. The request for a
price redetermination shall be given in writing by SELLER to BUYER not later
than 120 days prior to the beginning of the Contract Year for which the price
redetermination is requested. Should such request not be given within the
required time, SELLER shall be deemed to have waived its option for that
two-year period only. The effective date of any price established by price rede-
termination shall be the beginning of the Contract Year, subject however, to the
provisions of Section 8 hereof.

"7.2 Within the same one hundred twenty (120) days following SELLER'S
request for a price redetermination, the parties shall mutually redetermine the
price by considering three (3) contracts under which the highest prices are
actually being paid for flowing gas ninety (90) days prior to the date the redeter-
mined price is to be effective. The contracts to be considered shall, (a) have a
primary term of one (1) or more years, (b) be for gas produced in Kansas, (c) be for
gas purchased by an interstate or intrastate company selling or using an average
daily volume of 5,000 MCF or more of gas for the twelve (12) months period
ending ninety (90) days prior to the date the redetermined price is to be effective,
(d) not be for the purchase of Spivey-Grabbs Field gas by BUYER under contracts
dated in 1975, (e) not include more than one contract of any one purchaser in any
one field, and (f) not be for a price then subject to regulatory suspense or refunds.
In determining the 'highest prices' being paid, and as they may apply to a fair
market price under this contract, BUYER and SELLER shall make valid adjust-
ments in pricing considerations, including but not limited to the heating value of
the gas, and costs of gathering, compression and processing rights."

## Commission Approval

"8.2 BUYER shall make application to the Kansas Corporation Commission for
approval of the pass-on of any of such increased costs of gas not later than sixty
(60) days prior to the date the applicable increase is scheduled to become
effective, or within five days after the increase has been established by arbitration
or by action of governmental or regulatory authorities. The failure of the Kansas
Corporation Commission to approve a pass-on within sixty days after application
by BUYER shall be deemed a rejection of the price increase for the purposes of
this gas contract.

"8.3 BUYER shall have the option, to be exercised by written notice to SELLER
not later than fifteen (15) days after the Kansas Corporation Commission shall
have rejected any such pass-on, to pay the increased price and in such event the
provisions of this gas contract shall remain in effect. If BUYER does not elect to
pay such increase then SELLER shall have the option to terminate this gas
contract on thirty days prior written notice."

## The Intent Clause

"23.1 It is the intention of the parties that the price adjustment provisions contained herein are solely for the purpose of compensating SELLER for the anticipated increase in its operating costs and for the anticipated increase in the value of its Natural Gas to be sold hereunder. It is understood that no price escalation, price redetermination or other pricing provision of this gas contract is for the purpose of offsetting any potential increase in SELLER'S Federal income tax liability as a result of the repeal of percentage depletion."

ERG invoked the price redetermination clause in 1977, and on November 27, 1977, the parties mutually accepted a price of $1.77 per MCF. This redetermined price was approved by the Kansas Corporation Commission and was the price paid by KPL during the calendar year 1978.

On November 9, 1978, Congress passed the Natural Gas Policy Act (NGPA), 15 U.S.C. §§ 3301-3432. This act (1) terminates the authority of the Federal Energy Regulatory Commission (FERC), successor to the Federal Power Commission, to prescribe rates for natural gas, and (2) establishes short term ceiling prices for various categories of natural gas. The sections of the act with which we are most concerned are as follows:

§ 2    (15 U.S.C. § 3301) is the definitions section. It defines "new well" as any well drilled after February 19, 1977, or the depth of which was increased by drilling after that date. It also defines "first sale" as any sale of natural gas "to any person for use by such person."

§ 102  (15 U.S.C. 3312) fixes the maximum lawful price for new natural gas. (The Section 102 price for new natural gas for the month of December 1978 was $2.078 per million BTU's).

§ 105  (15 U.S.C. 3315) fixes the ceiling price for gas sales under existing intrastate contracts. Subsection (b) (1) reads as follows:

"(b) **Maximum lawful price**
    "(1) **General rule**
        "Subject to paragraphs (2) and (3), the maximum lawful price under this section shall be the lower of—
        "(A) the price under the terms of the existing contract, to which such natural gas was subject on November 9, 1978, as such contract was in effect on such date; or
        "(B) the maximum lawful price, per million Btu's computed for such month under Section 3312 of this title (relating to new natural gas)."

§ 601 (15 U.S.C. § 3431) terminates the authority of the FERC to prescribe rates for both intrastate and interstate natural gas, beginning December 1, 1978. (The rates previously fixed by the Commission are left operative until that date.)

§ 602 (15 U.S.C. § 3432) provides that nothing in the NGPA "shall affect the authority of any State to establish or enforce any maximum lawful price for the first sale of natural gas produced in such State which does not exceed" the maximum ceiling price fixed by the act.

On November 20, 1978, ERG notified KPL by letter that the gas price would increase on December 1, 1978, to the Section 102 price.

On December 1, 1978, the FERC announced interim regulations, one of which, effective on that date, provided that "[T]he establishment of maximum lawful prices under the NGPA shall not trigger indefinite price escalator clauses in existing intrastate or interstate contracts." 43 Fed. Reg. 56448, 56550 § 270.205(a) (Interim Regulations 1978).

KPL petitioned the KCC on December 7, 1978, for pass-through approval of the Section 102 rates demanded by ERG. KPL filed a supplemental petition relating to the pass-through of these increased prices on February 2, 1979. Seventy-five days from KPL's December 7th application was February 20, 1979.

On February 13, 1979, the FERC issued a notice of proposed changes in its rules; the interim regulations were continued in full force and effect during the comment period. 44 Fed. Reg. 16896 (March 20, 1979). The FERC, on March 13, 1979, issued Order No. 23, which withdrew the prohibition of the operation of indefinite price escalator clauses, retroactive to December 1, 1978. The Order reserves to state law the determination of whether such clauses operate in intrastate contracts. 44 Fed. Reg. 16895, 16904 (March 20, 1979).

Next in the series of events was the enactment by the Kansas legislature of the Kansas Natural Gas Price Protection Act, K.S.A. 1980 Supp. 55-1401 *et seq.* (which we shall refer to as the Kansas Act or the Price Protection Act), which became effective upon its publication in the official state paper on May 29, 1979. Some of the salient features of this act are as follows:

55-1402 defines "gas purchase contract" as "any contract under which natural gas is sold within the state of Kan-

sas . . . (2) to any person for use by such person . . ."
and it defines "indefinite price escalator clause" as "any pro-
vision of a gas purchase contract which provides for the
establishment or adjustment of the price of natural gas deliv-
ered under such contract by reference to other prices for
natural gas. . . ."

55-1403 provides that the act shall apply only to contracts
entered into before April 20, 1977.

55-1404 restricts the operation of indefinite price escalator
clauses. With certain exceptions, it provides that:

"[O]n or after December 1, 1978, the price allowed to be paid pursuant to federal
legislation or any regulation by an agency implementing such legislation, or the
price paid or to be paid for any sale of natural gas in the state of Kansas shall not
be taken into account in applying any indefinite price escalator clause contained
in any gas purchase contract subject to this act, to the extent that such contract
provides for the sale in the state of Kansas, of gas produced within this state which
was not committed or dedicated to interstate commerce on November 8, 1978.
This section shall not require a reduction of any price contained in any gas
purchase contract subject to this act below the price actually paid prior to the date
of enactment of this act."

55-1408 provides that this act shall not limit the voluntary
renegotiation of price provisions contained in natural gas pur-
chase contracts.

55-1411 declares that the price limitations defined in this act
shall terminate not later than December 31, 1984.

ERG, by letter dated June 5, 1979, notified KPL of its intent to
terminate the contracts in thirty days, on July 5, 1979, based on
(1) the failure of KPL to make application to the KCC for pass-on
authority within five days of December 1, 1978, (2) the failure of
KPL to obtain KCC approval for the payment of the Section 102
price, and (3) the failure of KPL to pay the increased price. ERG
contended that the pricing provisions of the NGPA triggered the
government price escalation clause, § 6.7 of the contract, and that
ERG was therefore entitled to the Section 102 price. KPL re-
sponded on June 13, 1979, denying that the government price
escalator clause was triggered by the NGPA, claiming that 55-
1404 of the Price Protection Act prevents the operation of the
escalator clause, and further contending that KPL had not vio-
lated the contract and ERG had no right to terminate the con-
tracts.

ERG filed its petition in the district court of Harper County on July 2, 1979, seeking a declaratory judgment that it had the right to terminate the contracts on the grounds set forth in its June 5 letter.

Next, on July 24, 1979, ERG wrote letters to KPL requesting that the price being paid under both contracts be redetermined under the price redetermination clauses of the contracts (§ 7, quoted above). KPL responded on July 27, stating in effect that K.S.A. 1980 Supp. 55-1404, a part of the Price Protection Act, prevents the operation of the price redetermination clauses in the contracts; therefore KPL could not agree to the requested price redetermination.

ERG then filed an amended petition in the trial court, including the claim that it was entitled to terminate the contracts because of KPL's refusal to renegotiate the price pursuant to the price redetermination clauses in the contracts. KPL answered, and also filed a counterclaim in which it sought a declaratory judgment that it had not breached the contract, that the contracts were still in effect, and that ERG had no lawful right to termination. Both parties attached to their pleadings copies of the contracts and of correspondence exchanged between them; both moved for summary judgment. Additional documents and affidavits were supplied the court in connection with those motions, and the parties agreed that the facts were not in dispute.

After extensive oral argument and the submission of briefs, the trial court issued a lengthy and detailed memorandum opinion on April 11, 1980, ruling in substance: (1) that the governmental price regulation clauses in the contracts were intended to apply to rates fixed by a regulatory authority, and that such rates are distinguishable from ceiling prices established by the NGPA; (2) that the NGPA did not trigger the indefinite price escalator clauses in the contracts; (3) that the parties may voluntarily renegotiate prices, but that ERG cannot have an automatic increase under either the government price escalator clause or the price redetermination clause for the reason that such price escalation is prohibited by the Kansas Price Protection Act; (4) that the case cannot be decided without determining the constitutionality of the Kansas act; and (5) that the Kansas act does not violate the contract clause of the United States Constitution. The court denied ERG's motion for summary judgment, and sustained that of KPL. ERG appeals.

The first point raised is that the trial court erred in finding that the government price escalation clauses in the contracts were not intended to be triggered by enactments such as the NGPA. ERG's principal contention on this issue is that the trial court utilized far too narrow an analysis of the government price redetermination clauses; ERG claims that if the court had examined the intent of the parties, it would have concluded that the NGPA was the kind of enactment which was within the contemplation of the parties when they entered into the contracts.

The terms of the government price redetermination clause in the contracts before us are much broader than the clause found in the contracts in the case of *Mesa Petroleum Co. v. Kansas Power & Light Co.,* 229 Kan. 631, 629 P.2d 190 (1981). The escalator clause here refers to "any federal or Kansas regulatory *or governmental authority."* In *Mesa,* under the more limited escalator clause there contained, we found: "It is reasonable to assume that parties intended if Congress increased the maximum prices for which gas might be sold that this would fulfill the reference in [the government price escalator clause present in the Mesa contract] to action by any successor governmental authority." The intention of the parties is clearly expressed in the ERG-KPL contracts, which contain an "intent clause" not found in the Mesa-KPL contracts; that clause clearly states that the purpose and intention of the parties is to increase the price of gas for the purpose of compensating ERG not only for anticipated increases in operating costs, but also for anticipated increases in the value of its natural gas.

The reasoning of the Federal Energy Regulatory Commission in its March 4, 1980, opinion in *Independent Oil and Gas Association of West Virginia,* Opinion No. 77, Util. L. Rep. (CCH) ¶ 12,274, is useful here. The Commission reaffirmed its holding in Order No. 23, referred to above, which withdrew the prohibition of the operation of indefinite price escalator clauses, sometimes also referred to as area rate clauses. The Commission said:

"The fundamental concept underlying Order 23 is that, in determining whether a particular clause authorizes collection of NGPA rates, the Commission will endeavor to ascertain and give effect to the intent of the parties to the contract. . . . [I]ntent is the controlling factor with respect to this issue. . . .

"Our conclusion that the Commission is not limited to the 'four corners' of a contract in determining intent was arrived at after thorough consideration of the

record developed in the rulemaking proceedings culminating in that order. . . . In view of the record developed in the rulemaking proceedings and in light of the accumulated experience of the Commission in dealing with area rate clauses in a variety of settings, there is ample reason to believe that the intent of the parties to permit prices to escalate to the highest rates allowed by law—including statutory rates—may not, in many cases, have been fully reflected in the terms they chose. Since the words they used were a product of the then prevailing regulatory scheme under the Natural Gas Act, we must attempt to ascertain, to the extent possible, what the parties intended to accomplish in the context of that regulatory environment and to give effect to that intent in light of the changed circumstances brought about by enactment of the NGPA. . . .

"[W]e do not believe their intent should be thwarted merely because they failed to foresee that the Congress would assume the ratemaking function previously delegated to the Commission . . . ." pp. 14, 444-45.

As applied to the facts before us, the fundamental holding of Opinion 77 is that the Commission will not conclude that the transfer of the ratemaking function from the Commission to Congress—most likely unforeseen by the parties at the time the contract was drafted—operates to defeat the intent of the parties simply because they expressed that intent in the terms of the then prevalent ratemaking system. For similar reasoning applied under the old ratemaking procedures, see *Amoco Production Co. v. Kansas Power & Light Co.,* 505 F. Supp. 628 (D. Kan. 1980).

The ERG-KPL contracts were executed in 1975, when rates were prescribed by the Commission. The contracts, however, refer not only to regulatory bodies but to any "governmental authority having jurisdiction," and certainly the Congress is such a body. Viewing the instruments from their four corners, we conclude that the instruments are not ambiguous, and that the parties *intended* that the government price escalation clauses be triggered by enactments such as the NGPA.

Whether the contract price escalated from its November 9 level to the Section 102 level, however, is dependent upon the escalation clause in the contracts. In *Pennzoil Co. v. Federal Energy Regulatory Comm'n,* 645 F.2d 360 (5th Cir. 1981), discussing Section 105 of the NGPA, the court says:

"If . . . the price on November 9th was less than section 102, under section 105 (b)(1) the maximum lawful price is the current price provided for under the terms of the contract as long as it does not exceed the section 102 price. . . . [In such a] case, the intrastate contract price may escalate from its November 9th level to the section 102 level, *provided that the contract has a sufficient escalation mechanism.*" (Emphasis supplied.) pp. 374-75.

The final sentence of Section 6.7 of the ERG-KPL contracts provides that "[i]n that event [that a governmental authority fixes a higher price] the increased price shall be effective as of the date of action of the governmental or regulatory authority establishing the regulated price [November 9, 1978], or its effective date [December 1, 1978], *whichever is later.* . . ." (Emphasis supplied.) The November 9th price, then, continued until December 1, 1978, under the clear terms of the contracts.

Section 105 (b)(1) of the NGPA fixes the maximum lawful price of intrastate gas as the lower of the Section 102 price or "the price under the terms of the existing contract, to which such natural gas was subject on November 9, 1978, as such contract was in effect on such date . . ." We hold that under the terms of the government price escalator clause in these contracts, and under the applicable section of the NGPA, the November 9th gas price (which was lower than the Section 102 price) did not escalate. The rationale expressed in the *Mesa Petroleum Co.* case is fully applicable here. The NGPA did not trigger a price increase because the contracts herein did not contain a sufficient escalation mechanism.

Appellant also contends that the district court erred in granting summary judgment as there were genuine issues of material fact, necessitating an evidentiary hearing. The fact issues, however, relate entirely to the intent of the parties, and since we have resolved that issue from the wording of the contracts themselves, no fact issue remains for determination.

The resolution of these issues, however, does not determine this lawsuit. We must also consider the price redetermination provision of the contracts, ERG's attempt to utilize those clauses, and the effect of the Price Protection Act thereon. The price redetermination clause provides in substance that upon request of the seller, the parties shall mutually redetermine the price by considering three contracts under which the highest prices are actually being paid for flowing gas. The "weighted average price" being paid under the contracts shall then become the redetermined price.

K.S.A. 1980 Supp. 55-1402(*c*) provides:

" 'Indefinite price escalator clause' means any provision of a gas purchase contract which provides for the establishment or adjustment of the price of natural gas delivered under such contract by reference to other prices for natural gas, for crude oil, or for refined petroleum products."

K.S.A. 1980 Supp. 55-1404 provides in substance that the price paid or to be paid for natural gas in the State of Kansas shall not be taken into account in applying any indefinite price escalator clause contained in any gas purchase contract subject to this act. The act applies to natural gas purchase contracts entered into before April 20, 1977, providing for the sale of natural gas produced in this state and not committed to interstate commerce.

ERG contends that the Kansas act does not apply because, in addition to the prices paid for natural gas under other contracts, the price redetermination clause here requires the parties to make adjustments with reference to other factors, including, but not limited to, the heating value of the gas, and costs of gathering, compression and processing rights. The primary thrust, however, of the price redetermination clause is to adjust and fix the price of the gas under these contracts based upon the price paid for natural gas under other contracts. The price redetermination clause in these contracts appears to fit precisely within the definition of "indefinite price escalator clause" included in the statute and set forth above. ERG's argument is not persuasive, and we hold that the Kansas act prohibits now, and at the time requested prohibited, price redetermination under the applicable section of the contracts. This issue cannot, as ERG suggests, be determined in a manner which would avoid the constitutional issue.

ERG contends that the Price Protection Act violates the contract clause set forth in Article 1, Section 10, of the Constitution of the United States. The contract clause reads as follows:

"No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."

A memorandum opinion of the trial judge reflects his research and careful thought in this area. He says:

"The constitutional bar against state legislation 'impairing the obligation of contracts' has not been given literal, unconditional application, making it destructive of the public interest by depriving the states of appropriate powers such as the right to impose price controls. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 [,57 L.Ed.2d 727, 98 S.Ct. 2716] (1978).

"The constitutionality of state legislation that alters contractual obligations of private parties is solely dependent upon whether or not such legislation is based upon reasonable conditions and is of character appropriate to the public purpose justifying its adoption. Legislation that is both reasonable and necessary to serve a public purpose does not offend the contract clause. To this end, the Supreme

Court has employed a balancing approach to resolve contract clause challenges. The Court has flexibly relied on several factors to determine the reasonableness of the legislative action. These include the severity of the legislation's impact on a private contract right, the scope and applicability of the legislation, and the importance of the public purpose that justifies its adoption.

"Here it is interesting to consider what the Court said in *United States Trust Co. v. New Jersey,* 431 U.S. 1 [, 52 L.Ed.2d 92, 97 S.Ct. 1505] (1977). I quote headnote 13 [52 L.Ed.2d at 95]:

" '13. Although the states must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired or even destroyed as a result, private contracts are not subject to unlimited modification under the states' police power for purposes of the contract clause of the U.S. Constitution (Art. I, § 10, cl. 1), prohibiting state impairment of contract obligations; legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption, *but, as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.'* [Emphasis added.]

"KPL contends that the reasonableness of the Price Protection Act is quite clear in light of its important public purpose and the minimal contractual interest that it impairs. I agree, and here it is appropriate to look at what the Legislative Report which accompanied H.B. 2680 states:

" 'Due to the changes in the Gas Pricing System brought about by NGPA, H.B. 2680 would have the effect of restricting somewhat abrupt and unanticipated increases in the price of old gas dedicated to intrastate commerce under certain gas purchase contracts which contain indefinite price escalator clauses.

" 'The NGPA of 1978 marked a radical reversal of the federal policy toward the pricing of natural gas. This law is directed toward increasing the price of gas, with the ultimate goal of deregulation of gas pricing. For many years the federal policy was directed toward pricing gas on a cost of service basis in interstate commerce. The new policy is to establish ceiling prices which will rise monthly to the point of final deregulation of many categories of natural gas production on December 31, 1984.

" 'Proponents believe that as a result of this legislation, many producers of natural gas, especially those whose contracts contain indefinite price escalator clauses, will reap unanticipated, windfall financial benefits. These benefits bear no real relationship to the costs of production of new gas, and are not even remotely related to old gas production costs. They accrue solely because of the reversal of federal policy.

" 'The proponents stated that the burden of the increased costs will be passed by utility companies directly to the consumer. *The producers will benefit beyond any expectations that they might have had only a few years ago* and the consumers, already buffeted by rapidly increasing inflation, including spiraling utility costs, will pay. Natural gas prices will continue to increase in the foreseeable future.

" 'The Congress recognized this scenario and, as a result, specifically reserved

to the states an area of price control applicable to intrastate gas sales, according to proponents.

" 'The proponents contended that H.B. 2680 represents an effort by the State of Kansas to minimize the impact on consumers of natural gas price increases of some intrastate gas from the present time through 1984. For a period of nearly six years, this bill would provide a modicum of restraint on some utility price increases.

" 'As a result of its hearings and deliberations, the majority of the Committee is strongly convinced that the single issue of the benefits to be derived by the affected Kansas consumers of natural gas clearly outweighs any adverse effects the gas producers or royalty owners said the bill might have. *Except where long-term, fixed price contracts are involved, the producers and royalty owners are benefiting significantly under the new NGPA. The bill merely prevents the producers from receiving the full amount of unanticipated gains that would be experienced.* Special Comm. on Energy and Natural Resources, *Report on H.B. 2680,* Exhibit A to Suggestions in Support of KPL's Cross Motion for Summary Judgment (Emphasis supplied).'

"The legitimate public purpose of the Price Protection Act cannot be questioned. See *Home Bldg. & L. Assn. v. Blaisdell,* 290 U.S. 398 at 444-45 [, 78 L.Ed. 413, 54 S.Ct. 231 (1934)]. In a time already facing serious problems of inflation, Kansas has a bona fide interest in addressing, and hopefully controlling, the serious economic dislocations that a sudden introduction of significantly higher energy costs would produce. The federal government acknowledged the legitimacy of this public purpose by expressly reserving to the states the option to so act.

"Under the standards of *Allied Structural Steel,* and prior case law, the Price Protection Act is a reasonable path chosen to achieve this important public purpose. The relief is appropriately tailored to meet the conditions it addresses, and is neither overbroad nor overly harsh. See *Allied Structural Steel,* 438 U.S. at 244. It affects only old gas and gas for which a higher price has not yet been paid. The Price Protection Act merely prevents an automatic triggering of indefinite price escalator clauses.

"Additionally, the Price Protection Act is limited in time as well as scope. Its controls extend over a period of a few years to lessen the economic shock to citizens, businesses and institutions of this state, who are otherwise suddenly subject to significantly higher prices for natural gas that affects virtually every aspect of their lives. The measure chosen by Kansas does not seek forever to foreclose the introduction of those higher prices into the economy, nor to deny gas producers the ultimate increases in the purchase price of their resource. The legislation gradually spreads out over the NGPA's time period for gradual price deregulation, the ultimate, and perhaps inevitable, impact of those higher prices.

"The ramifications of the sudden introduction of these higher prices are clear. The Price Protection Act merely regulates these evils by graduating the introduction of higher natural gas prices into the Kansas economy. Some price increases are presently allowed, especially those that encourage new exploration and production from higher cost or low yield sources. Negotiations for new contractual price provisions are permitted to guarantee a measure of fairness. Automatic

price escalations, however, triggered by indefinite escalator clauses and unrelated to cost of production or factors of supply and demand, are postponed. A more reasonable and specifically tailored approach to the problem could hardly be imagined.

"In reviewing economic and social legislation against Contract Clause challenges, courts should defer to the legislature's judgment of the necessity and reasonableness of a particular measure. *United States Trust Co. v. New Jersey,* 431 U.S. at 23; *East New York Bank v. Hahn,* 326 U.S. 230 [, 90 L.Ed. 34, 66 S.Ct. 69] (1945). Even without that presumption of reasonableness and necessity, the Price Protection Act manifestly represents 'legislation adjusting the rights and responsibilities of contracting parties . . . upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption.' *Allied Structural Steel,* 438 U.S. at 244, quoting *United States Trust Co.,* 431 U.S. at 22; *Home Bldg. & L. Assn.,* 290 U.S. at 445-47.

"Both the nature of the regulation provided by H.B. 2680, and the commodity regulated, are high on the list of priorities of governmental restrictions and regulations. I refer to price regulation and energy. There is an abundance of precedent for price control legislation much more stringent than H.B. 2680, beginning with *Munn v. Illinois,* 94 U.S. 113 [, 24 L.Ed. 77] (1876), and continuing through the *Permian Basin Area Rate Cases,* 390 U.S. 747 [, 20 L.Ed.2d 312, 88 S.Ct. 1344] (1968), upholding an absolute prohibition on the operation of indefinite price escalator clauses. There is a very close connection with the manner the courts handle the contract clause of the U.S. Constitution and with the way they treat the due process clause of the Fourteenth Amendment. The Supreme Court has expressly stated that the states' power reasonably to regulate natural gas prices cannot seriously be questioned under the due process clause. As to the commodity being regulated, we would all have to be blind, deaf and dumb not to be aware that long before H.B. 2680 was enacted there was a national campaign to control all types of energy, including natural gas, which campaign or movement is still very much alive and can almost be classified as a crusade."

We agree with the district judge, and adopt the quoted portion of his memorandum opinion.

The NGPA constituted an entirely new and drastically different approach to the pricing of natural gas; it broke with the past, and substituted deregulation for close agency regulation under which the industry had operated for many years. Contract prices for natural gas on November 9, 1978, as disclosed by the several recent cases before us, varied from less than thirty cents per Mcf to more than $1.90 per Mcf. The Section 102 price for new gas and for natural gas produced on the outer continental shelf exceeded $2.00 per Mcf. The anticipated sudden escalation of intrastate gas prices threatened both gas and electric utility rates. The legislature was cognizant of this emergency situation when it considered and enacted the Kansas Natural Gas Price Protection Act. That act protects the public generally from an

immediate increase in rates; with allowed monthly increases, the rate increases will be phased in over a period of several years.

The legislation addresses an important public purpose. Under all of the attendant circumstances, we conclude that the legislation, and the tempering of price increases which it provides, are reasonable and appropriate.

ERG contends that the Kansas Act is retroactive to December 1, 1978, and, since it impairs the contract and disturbs the vested rights of ERG under the contract as of that date, it must fall. The statute obviously was intended to and does impair the rights of ERG under the contracts to invoke the price redetermination clause, and thus secure higher prices for its gas based upon prices paid for other gas. The date chosen for the retroactivity, December 1, 1978, is the date upon which the orders of FERC, regulating rates, ceased to be operative, and the provisions of the NGPA took effect.

The trial court concluded that the statute had no retroactive application. Since ERG did not attempt to invoke the price redetermination clause provisions of the contract until after the effective date of the statute, the application would appear to be primarily prospective only. However, ERG contends that it had the right under the contract to price redetermination, which rights vested upon the date the contract was executed, and that these rights were taken away when the Price Protection Act became effective, retroactive to December 1, 1978. The statute, as we have pointed out, was enacted under the police power of the state to regulate the intrastate price of natural gas. If the legislature could not make the statute retroactive to December 1, 1978, then it would have no effective way to control intrastate natural gas prices. Automatic escalator clauses, activated during that period, would nullify the powers of the state to protect its citizens in this important area. We conclude that the Kansas Act is an appropriate exercise of the police power of the state, that it was reasonable and fully justified under the circumstances, and that it is not unconstitutional upon the basis of its retroactivity.

Finally, ERG contends that the district court erred in failing to consider ERG's optional right to terminate the contracts. Its right to terminate depended upon (1) whether the price increased, and (2) whether KPL violated the contract terms. Since, as we have

held, the price did not escalate, KPL did not violate the contract terms and ERG had no right to terminate the contracts.

We have carefully considered the arguments and the authorities cited by counsel, but we find them unpersuasive and we will not prolong this opinion by a recital thereof.

The judgment is affirmed.