# ENERGY RESERVES GROUP, INC. *v.* KANSAS POWER & LIGHT CO.

No. 81–1370.  Argued November 9, 1982—Decided January 24, 1983

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, STEVENS, and O'CONNOR, JJ., joined, and in all but Part II-C of which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined. POWELL, J., filed an opinion concurring in part, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 421.

*Gary W. Davis* argued the cause for appellant. With him on the briefs were *Martin W. Bauer, Clark Mandigo, Edwin W. Parker II, I. Michael Greenberger,* and *Nancy J. Bregstein.*

*Basil W. Kelsey* argued the cause for appellee. With him on the brief were *Jerome T. Wolf, Terry W. Schackmann,* and *David S. Black.**

*Briefs of *amici curiae* urging affirmance were filed by *Brian J. Moline,* Special Assistant Attorney General of Kansas, for the State Corporation Commission of the State of Kansas; by *William E. Metcalf* and *Patrick H. Donahue* for Kansas Legal Services, Inc.; by *Jan Eric Cart-*

JUSTICE BLACKMUN delivered the opinion of the Court.

This case concerns the regulation by the State of Kansas of the price of natural gas sold at wellhead in the intrastate market. It presents a federal Contract Clause issue and a statutory issue.

## I

On September 27, 1975, The Kansas Power & Light Company (KPL), a public utility and appellee here, entered into two intrastate natural gas supply contracts with Clinton Oil Company, the predecessor-in-interest of appellant Energy Reserves Group, Inc. (ERG). Under the first contract, KPL agrees to purchase gas directly at the wellhead on the Spivey-Grabs Field in Kingman and Harper Counties in southern Kansas. The second contract obligates KPL to purchase from the same field residue gas, that is, gas remaining after certain recovery and processing steps are completed. The original contract price was $1.50 per thousand cubic feet (Mcf) of gas. The contracts continue in effect for the life of the field or for the life of the processing plants associated with the field.

## A

Each contract contains two clauses known generically as indefinite price escalators. The first is a governmental price escalator clause; this provides that if a governmental authority fixes a price for any natural gas that is higher than the price specified in the contract, the contract price shall be increased to that level.[1] The second is a price redetermination

wright, Attorney General of Oklahoma, *Robert D. Stewart, Jr.*, and *Eddie M. Pope* for the Oklahoma Corporation Commission; and by *Dennis G. Lyons, Mark J. Spooner, John L. Arrington, Jr., Curtis M. Long, Jay M. Galt*, and *Harry W. Birdwell* for Oklahoma Natural Gas Co. et al.

[1] The governmental price escalator provision states:

"If any federal or Kansas regulatory or governmental authority having jurisdiction in the premises shall at any time hereafter fix a price per MCF applicable to any natural gas of any vintage produced in Kansas, higher than the contract price then in effect under this gas contract, the price to

clause; this gives ERG the option to have the contract price redetermined no more than once every two years.[2]  The new price is then set by averaging the prices being paid under three other gas contracts chosen by the parties.

When the price is increased pursuant to either of these clauses, each contract requires KPL to seek from the Kansas Corporation Commission (Commission) approval to pass the increase through to consumers.  App. to Juris. Statement 69a.  The application for approval is to be submitted within 5 days after a price increase resulting from governmental ac-

---

be paid for gas thereafter shall be increased to equal such regulated price. In that event, the increased price shall be effective as of the date of action of the governmental or regulatory authority establishing the regulated price, or its effective date, whichever is later . . . ."  App. to Juris. Statement 66a.

[2] The price redetermination provision states in relevant part:

"SELLER shall have the option to cause the price being paid for its gas by BUYER to be redetermined every two years, beginning in 1977.  The request for a price redetermination shall be given in writing by SELLER to BUYER not later than 120 days prior to the beginning of the Contract Year for which the price redetermination is requested. . . .

". . . Within the same one hundred twenty (120) days following SELLER'S request for a price redetermination, the parties shall mutually redetermine the price by considering three (3) contracts under which the highest prices are actually being paid for flowing gas ninety (90) days prior to the date the redetermined price is to be effective.  The contracts to be considered shall, (a) have a primary term of one (1) or more years, (b) be for gas produced in Kansas, (c) be for gas purchased by an interstate or intrastate company selling or using an average daily volume of 5,000 MCF or more of gas for the twelve (12) months period ending ninety (90) days prior to the date the redetermined price is to be effective, (d) not be for the purchase of Spivey-Grabs Field gas by BUYER under contracts dated in 1975, (e) not include more than one contract of any one purchaser in any one field, and (f) not be for a price then subject to regulatory suspense or refunds. . . .

"After the BUYER and SELLER have decided on the three contracts and appropriate prices to be used from each one for this redetermination, the weighted average price per MCF being paid under the three contracts shall be calculated.  This price shall become the redetermined price to be paid by BUYER to SELLER."  Id., at 67a–68a.

tion, or no fewer than 60 days before a price redetermination increase is to become effective. *Ibid.* If the Commission refuses to permit the pass-through and KPL elects not to pay the increase, ERG has the option to terminate the agreement on 30 days' written notice.

Each contract states that the purpose of the price escalator clauses is "solely" to compensate ERG for "anticipated" increases in its operating costs and in the value of its gas. *Id.*, at 70a. Each contract also provides: "Neither party shall be held in default for failure to perform hereunder if such failure is due to compliance with," *ibid.*, any "relevant present and future state and federal laws." *Id.*, at 69a.

In 1977, ERG invoked the price redetermination clause, and the parties agreed on a price of $1.77 per Mcf, effective November 27 of that year. The Commission approved the pass-through of this increase to consumers. KPL paid the new price through 1978.[3]

## B

On December 1, 1978, the Natural Gas Policy Act of 1978 (Act), Pub. L. 95–621, 92 Stat. 3350, 15 U. S. C. § 3301 *et seq.* (1976 ed., Supp. V), designed in principal part to encourage increased natural gas production, became effective. The Act replaced the federal price controls that had been established under the Natural Gas Act, ch. 556, 52 Stat. 821, with price ceilings that rise monthly based on "an inflation adjustment factor" and other considerations. Different ceilings are set for different types of gas. Section 102 of the Act, 15 U. S. C. § 3312 (1976 ed., Supp. V), sets a gradually increasing ceiling price for newly discovered or newly produced natural gas. The December 1978 ceiling price under § 102 was

---

[3] On June 9, 1978, the Commission gave KPL permission to implement a purchased-gas price adjustment. This authorized an automatic pass-through to consumers of wholesale gas cost increases upon written notice to the Commission. The Commission retained authority to review and revoke any pass-through under its normal standards for reviewing rate increases.

$2.078 per million British thermal units. Section 104 sets ceiling prices for "old" interstate gas, that is, gas from already discovered and producing wells. Section 109 sets another ceiling price for categories of natural gas not covered by the other sections of the Act. As of December 1978, the § 109 ceiling price was $1.63 per million Btu's.

In another departure from the 1938 Natural Gas Act, the new Act extended federal price regulation to the intrastate gas market. See S. Conf. Rep. No. 95–1126, pp. 67–68 (1978); H. R. Conf. Rep. No. 95–1752, pp. 67–68 (1978). Section 105 of the Act establishes the rule for applying price ceilings to intrastate gas, described as gas not committed to interstate commerce on November 8, 1978.[4] It provides, in its subsection (b)(1), that the maximum lawful price of such gas "shall be the lower of . . . the price under the terms of the existing contract, to which such natural gas was subject on [November 9, 1978], . . . or . . . the maximum lawful price . . . computed for such month under section 102 (relating to new natural gas)."[5] The parties agree that § 105(b)(1) governs these contracts.

The Act, by § 602(a), also permits a State "to establish or enforce any maximum lawful price for the first sale of natural

---

[4] In pertinent part, § 105 provides:

"(a) Application.—The maximum lawful price computed under subsection (b) shall apply to any first sale of natural gas delivered during any month in the case of natural gas, sold under any existing contract or any successor to an existing contract, which was not committed or dedicated to interstate commerce on the day before the enactment of this Act.

"(b) Maximum lawful price.—

"(1) General rule.—Subject to paragraphs (2) and (3), the maximum lawful price under this section shall be the lower of—

"(A) the price under the terms of the existing contract, to which such natural gas was subject on the date of the enactment of this Act [November 9, 1978], as such contract was in effect on such date; or

"(B) the maximum lawful price, per million Btu's, computed for such month under section 102 (relating to new natural gas)."

[5] Section 105(b)(2) applies to contracts under which the price of gas on November 9, 1978, exceeded the § 102 price.

gas produced in such State which does not exceed the applicable maximum lawful price, if any, under title I of this Act."

## C

In direct response to the Act, the Kansas Legislature promptly imposed price controls on the intrastate gas market. In May 1979, the Kansas Natural Gas Price Protection Act (Kansas Act), 1979 Kan. Sess. Laws, ch. 171, codified as Kan. Stat. Ann. §§ 55–1401 to 55–1415 (Supp. 1982), was enacted.[6] The Kansas Act applies only to natural gas contracts executed before April 20, 1977, § 55–1403, and controls natural gas prices until December 31, 1984, § 55–1411. Section 55–1404 prohibits consideration either of ceiling prices set by federal authorities or of prices paid in Kansas under other contracts in the application of governmental price escalator clauses and price redetermination clauses.[7] Section

---

[6] ERG asserts that the Kansas Act is special interest legislation designed to permit KPL to avoid gas price increases and to aid KPL in this and other litigation. ERG notes that KPL supported the bill, that the Special Joint Committee approved the bill by only a narrow margin, and that several members of the Committee's minority believed the bill to be special interest legislation. Brief for Appellant 9–12. The bill, however, was supported by the Governor, labor unions, farmers, and municipal representatives, and was passed by substantial margins in both Houses of the Kansas Legislature. Although KPL purchases a sizable portion of the gas affected by the Kansas Act, there are other purchasers as well. Moreover, as indicated in n. 3, *supra*, KPL already had obtained from the Commission a purchased-gas price adjustment that allowed it to pass through to its customers any gas cost increase.

[7] Section 55–1404 provides, with certain exceptions, that "on or after December 1, 1978, the price allowed to be paid pursuant to federal legislation or any regulation by an agency implementing such legislation, or the price paid or to be paid for any sale of natural gas in the state of Kansas shall not be taken into account in applying any indefinite price escalator clause contained in any gas purchase contract subject to this act, to the extent that such contract provides for the sale in the state of Kansas, of gas produced within this state which was not committed or dedicated to interstate commerce on November 8, 1978. This section shall not require a reduction of any price contained in any gas purchase contract subject to this act below the price actually paid prior to the date of enactment of this act."

55–1405 of the Kansas Act, however, permits indefinite price escalator clauses to operate after March 1, 1979, to raise the price of old intrastate gas up to the federal Act's § 109 ceiling price. Section § 55–1406 exempts new gas and gas from stripper wells.

## D

On November 20, 1978, ERG and other gas suppliers having similar contracts with KPL notified KPL that gas prices would be escalated to the § 102 price on December 1, pursuant to the governmental price escalator clause. KPL sought pass-through approval from the Commission for this increase by an application filed December 7, one day too late to satisfy the 5-day contractual requirement. KPL never elected to pay the higher price.

On June 5, 1979, ERG notified KPL that it would terminate the contracts within 30 days because KPL had failed to apply to the Commission for pass-through authority within five days of December 1, 1978, had failed to obtain Commission approval, and had failed to pay the increased price ERG contends was required by the governmental price escalator clause. KPL's response was that the clause was not triggered by the Act and that the Kansas Act prohibited its activation. ERG then filed an action in the District Court of Harper County, Kan., praying for a declaratory judgment that it had the contractual right to terminate the contracts.

On July 24, in light of KPL's refusal to terminate, ERG requested an increase up to the Act's § 102 ceiling price under the price redetermination clause. The increase was to be effective in November 1979, the next redetermination date possible under the contracts. KPL conceded that the price redetermination clause permitted such an increase, but contended that § 55–1404 of the Kansas Act had extinguished the utility's obligation to comply with that clause. ERG then filed an amended complaint, alleging that it was entitled to terminate the contracts because of KPL's refusal to redeter-

mine the price. KPL counterclaimed for a declaratory judgment that the contracts were still in effect.

On the parties' cross-motions for summary judgment, the state trial court held that the Act's imposition of price ceilings on intrastate gas did not trigger the governmental escalator clause. It also found that the Kansas Act did not violate the Contract Clause, reasoning that Kansas has a legitimate interest in addressing and controlling the serious economic dislocations that the sudden increase in gas prices would cause, and that the Kansas Act reasonably furthered that interest. App. to Juris. Statement 25a, 42a, 45a. The Supreme Court of Kansas, by unanimous vote, affirmed. 230 Kan. 176, 630 P. 2d 1142 (1981).[8] We noted probable jurisdiction. 456 U. S. 904 (1982).

## II

ERG raises both statutory and constitutional issues in challenging the ruling of the Kansas Supreme Court. The constitutional issue is whether the Kansas Act impairs ERG's contracts with KPL in violation of the Contract Clause, U. S. Const., Art. I, § 10, cl. 1.[9] The statutory issue is whether the federal enactment of § 105 triggered the governmental price escalator clause. As to the latter issue, if § 105's enactment did have that effect, ERG was entitled to a price increase on December 1, 1978. If not, ERG could rely only on the price redetermination clause for any increase. That clause could not be exercised until November 1979. The

---

[8] The court held that an emergency situation existed because the anticipated sudden escalation of intrastate gas prices threatened to boost dramatically both gas and electricity utility rates. The court suggested that because ERG had not attempted to exercise the price redetermination clause prior to the date of enactment, the Kansas Act was being applied only prospectively. The court concluded, however, that the State's interest and chosen means could justify a retroactive application. 230 Kan., at 189–190, 630 P. 2d, at 1153.

[9] "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."

statutory issue thus controls the timing of any increase. The constitutional issue, on the other hand, affects the price that ERG may claim under either clause. If ERG prevails, the price may be escalated to the § 102 ceiling; if ERG does not prevail, the price may be escalated only to the § 109 ceiling. We consider the Contract Clause issue first.[10]

### A

Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State "to safeguard the vital interests of its people." *Home Bldg. & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 434 (1934). In *Blaisdell*, the Court approved a Minnesota mortgage moratorium statute, even though the statute retroactively impaired contract rights. The Court balanced the language of the Contract Clause against the State's interest in exercising its police power, and concluded that the statute was justified.[11]

The Court in two recent cases has addressed Contract Clause claims. In *United States Trust Co.* v. *New Jersey*, 431 U. S. 1 (1977), the Court held that New Jersey could not retroactively alter a statutory bond covenant relied upon by bond purchasers. One year later, in *Allied Structural Steel Co.* v. *Spannaus*, 438 U. S. 234 (1978), the Court invalidated a Minnesota statute that required an employer who closed its office in the State to pay a "pension funding charge" if its

---

[10] If fairly possible, we of course construe a statute so as to avoid a constitutional question. *Machinists* v. *Street*, 367 U. S. 740, 749–750 (1961). Because, however, the statutory issue affects only the operation of the governmental price escalator clause, its resolution in no way obviates the need to scrutinize the Kansas Act under the Contract Clause.

[11] The Court listed five factors that were then deemed to be significant in its analysis: whether the Act (1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency. 290 U. S., at 444–447.

pension fund at the time was insufficient to provide full benefits for all employees with at least 10 years' seniority.[12] Although the legal issues and facts in these two cases differ in certain ways, they clarify the appropriate Contract Clause standard.

The threshold inquiry is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co.*, 438 U. S., at 244. See *United States Trust Co.*, 431 U. S., at 17. The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected. *Allied Structural Steel Co.*, 438 U. S., at 245. Total destruction of contractual expectations is not necessary for a finding of substantial impairment. *United States Trust Co.*, 431 U. S., at 26–27. On the other hand, state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment. *Id.*, at 31, citing *El Paso* v. *Simmons*, 379 U. S. 497, 515 (1965). In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past. *Allied Structural Steel Co.*, 438 U. S., at 242, n. 13, citing *Veix* v. *Sixth Ward Bldg. & Loan Assn.*, 310 U. S. 32, 38 (1940) ("When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic"). The Court long ago observed: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson Water Co.* v. *McCarter*, 209 U. S. 349, 357 (1908).

If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, *United*

---

[12] See also *Malone* v. *White Motor Corp.*, 444 U. S. 911 (1979), summarily aff'g 599 F. 2d 283 (CA8).

*States Trust Co.*, 431 U. S., at 22, such as the remedying of a broad and general social or economic problem. *Allied Structural Steel Co.*, 438 U. S., at 247, 249. Furthermore, since *Blaisdell*, the Court has indicated that the public purpose need not be addressed to an emergency or temporary situation. *United States Trust Co.*, 431 U. S., at 22, n. 19; *Veix* v. *Sixth Ward Bldg. & Loan Assn.*, 310 U. S., at 39–40. One legitimate state interest is the elimination of unforeseen windfall profits. *United States Trust Co.*, 431 U. S., at 31, n. 30. The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests.[13]

Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of "the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *United States Trust Co.*, 431 U. S., at 22. Unless the State itself is a contracting party, see *id.*, at 23,[14] "[a]s is customary in re-

---

[13] In *Allied Structural Steel Co.* v. *Spannaus*, the Court held that the Minnesota pension law severely impaired established contractual relations between employers and employees. The State had not acted to meet an important general social problem. The pension statute had a very narrow focus: it was aimed at specific employers. Indeed, it even may have been directed at one particular employer planning to terminate its pension plan when its collective-bargaining agreement expired. See 438 U. S., at 247–248, and n. 20.

[14] See generally Note, A Process-Oriented Approach to the Contract Clause, 89 Yale L. J. 1623, 1647–1648 (1980) (distinguishing public from private contracts). In *United States Trust Co.*, but not in *Allied Structural Steel Co.*, the State was one of the contracting parties. When a State itself enters into a contract, it cannot simply walk away from its financial obligations. In almost every case, the Court has held a governmental unit to its contractual obligations when it enters financial or other markets. See *United States Trust Co.*, 431 U. S., at 25–28; *W. B. Worthen Co.* v. *Kavanaugh*, 295 U. S. 56 (1935); *Murray* v. *Charleston*, 96 U. S. 432 (1878). But see *Faitoute Iron & Steel Co.* v. *City of Asbury Park*, 316 U. S. 502 (1942). When the State is a party to the contract,

viewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.*, at 22–23.

### B

The threshold determination is whether the Kansas Act has impaired substantially ERG's contractual rights. Significant here is the fact that the parties are operating in a heavily regulated industry.[15] See *Veix* v. *Sixth Ward Bldg. & Loan Assn.*, 310 U. S., at 38. State authority to regulate natural gas prices is well established. See *Cities Service Gas Co.* v. *Peerless Oil & Gas Co.*, 340 U. S. 179 (1950).[16] At the time of the execution of these contracts, Kansas did not regulate natural gas prices specifically,[17] but its supervi-

---

"complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *United States Trust Co.*, 431 U. S., at 26. In the present case, of course, the stricter standard of *United States Trust Co.* does not apply because Kansas has not altered its own contractual obligations.

[15] In addition to the Kansas and federal regulations, 38 States regulate various aspects of gas production and sale. See Interstate Oil Compact Commission, Summary of State Statutes and Regulations for Oil and Gas Production (1979).

[16] For some time, the Court has recognized the validity of state regulation of the production and sale of natural gas in furtherance of conservation goals. See *Ohio Oil Co.* v. *Indiana*, 177 U. S. 190, 210 (1900); see also 5 E. Kuntz, Law of Oil and Gas § 70.2, p. 307 (1978); cf. *Henderson Co.* v. *Thompson*, 300 U. S. 258, 266 (1937) (state statute retrospectively regulating the contractual sale of natural gas containing different amounts of hydrogen sulfide does not violate Contract Clause of Texas Constitution). On several occasions, the Court has approved state price regulation of natural gas that did not interfere with interstate commerce. See, *e. g.*, *Phillips Petroleum Co.* v. *Oklahoma*, 340 U. S. 190 (1950); *Cities Service Gas Co.* v. *Peerless Oil & Gas Co.*, 340 U. S. 179 (1950); *Pennsylvania Gas Co.* v. *Public Service Comm'n*, 252 U. S. 23 (1920); 5 E. Kuntz, *supra*, § 75.2, p. 371.

[17] Kansas in the past has regulated the wellhead price of natural gas. See *Cities Service Gas Co.* v. *State Corporation Comm'n*, 355 U. S. 391 (1958), rev'g 180 Kan. 454, 304 P. 2d 528 (1956). Although this Court struck down the Commission's earlier attempt to set a wellhead price, it

sion of the industry was extensive and intrusive.[18]   Moreover, under the authority of § 5(a) of the 1938 Natural Gas Act, the Federal Power Commission (FPC) set "just and reasonable" rates for prices of gas both at the wellhead and in pipelines.   Although prices in the intrastate market have diverged somewhat from those in the interstate market due to the recent shortage of natural gas,[19] the regulation of interstate prices effectively limits intrastate price increases.[20]

---

apparently did so because the price regulation extended to gas in interstate commerce.   See 355 U. S., at 392, citing *Phillips Petroleum Co.* v. *Wisconsin,* 347 U. S. 672 (1954), and *Natural Gas Pipeline Co.* v. *Panoma Corp.,* 349 U. S. 44 (1955); see n. 16, *supra.*   The instant case does not raise a Commerce Clause issue because the parties agree that the gas is not in interstate commerce and because Congress, by § 602, authorized the State to regulate its price.   See S. Conf. Rep. No. 95–1126, p. 125 (1978) ("The Congress . . . is ceding its authority under the commerce clause of the Constitution to regulate prices for such production to affected States"); H. R. Conf. Rep. No. 95–1752, p. 125 (1978) (same).

[18] For more than 75 years now, Kansas has regulated the production, transportation, distribution, and sale of natural gas.   See *Cities Service Gas Co.* v. *State Corporation Comm'n,* 222 Kan. 598, 609–610, 567 P. 2d 1343, 1352 (1977).

[19] Because of the shortage, some gas was diverted to the intrastate market where consumers were willing to pay higher prices.   "As the FPC price ceiling dropped below market levels prevailing in the intrastate sector, new gas supply has increasingly gravitated toward the latter." Federal Trade Commission, Staff Report of the Bureau of Economics, J. Mulholland, The Economic Structure and Behavior in the Natural Gas Production Industry 10 (1979) (footnote omitted); see Executive Office of the President, The National Energy Plan 18 (1977), reprinted in 1 National Energy Plan, 95th Congress: Legislative History of the National Energy Acts of 1978 (item 5) (1979); Comment, For Gas, Congress Spells Relief N-G-P-A: An Analysis of the Natural Gas Policy Act of 1978, 40 U. Pitt. L. Rev. 429, 434 (1979).   The Emergency Natural Gas Act of 1977, § 6(a), Pub. L. 95–2, 91 Stat. 7, addressed this problem by extending federal price regulation to the intrastate market during a Presidentially declared emergency.   These emergency provisions were carried forward in § 302(a) of the 1978 Act.

[20] "Even if the gas can be sold intrastate, FPC price ceilings will indirectly affect price levels in the unregulated sector over the long

It is in this context that the indefinite escalator clauses at issue here are to be viewed. In drafting each of the contracts, the parties included a statement of intent, which made clear that the escalator clause was designed to guarantee price increases consistent with *anticipated* increases in the value of ERG's gas. App. to Juris. Statement 70a. While it is not entirely inconceivable that ERG in September 1975 anticipated the deregulation of gas prices introduced by the Act in 1978, we think this is highly unlikely, and we read the statement of intent to refer to nothing more than changes in value resulting from changes in the federal regulator's "just and reasonable" rates. In exchange for these anticipated increases, KPL agreed to accept gas from the Spivey-Grabs field for the lifetime of that field. Thus, at the time of the execution of the contracts, ERG did not expect to receive deregulated prices. The very existence of the governmental price escalator clause and the price redetermination clause indicates that the contracts were structured against the background of regulated gas prices. If deregulation had not occurred, the contracts undoubtedly would have called for a much smaller price increase than that provided by the Kansas Act's adoption of the § 109 ceiling.[21]

term." P. Starratt, The Natural Gas Shortage and the Congress 29 (1974). Determining the actual effect on the intrastate market of federal regulation of the interstate market is difficult because state oil and gas agencies have not collected information on intrastate sales. See Schanz & Frank, Natural Gas in the Future National Energy Pattern, in Regulation of the Natural Gas Producing Industry 18, 28–30 (K. Brown ed. 1972).

[21] Absent deregulation, the existing interstate price would have continued to act as a brake on increases ERG could obtain under the price redetermination clause. As has been noted, the originally specified contract price was $1.50 per Mcf. App. to Juris. Statement 66a. Under the contract, ERG was entitled to an increase of two cents per Mcf each year absent a price redetermination in excess of that amount. *Ibid.* A price redetermination occurred in November 1977, and by November 1978, the contract price had risen to $1.77 per Mcf. The July 1982 § 109 price ceiling was $2.194 and the § 102 ceiling was $3.152. 47 Fed. Reg. 17981, 17982 (1982). There is no reason to believe that, by operation of either escalator

Moreover, the contracts expressly recognize the existence of extensive regulation by providing that any contractual terms are subject to relevant present and future state and federal law.[22]   This latter provision could be interpreted to incorporate all future state price regulation, and thus dispose of the Contract Clause claim.   Regardless of whether this interpretation is correct,[23] the provision does suggest that ERG knew its contractual rights were subject to alteration by state price regulation.   Price regulation existed and was foreseeable as the type of law that would alter contract obligations.   Reading the Contract Clause as ERG does would mean that indefinite price escalator clauses could exempt ERG from any regulatory limitation of prices whatsoever. Such a result cannot be permitted.   *Hudson Water Co.* v. *McCarter*, 209 U. S., at 357.   In short, ERG's reasonable expectations have not been impaired by the Kansas Act. See *El Paso* v. *Simmons*, 379 U. S., at 515.

## C

To the extent, if any, the Kansas Act impairs ERG's contractual interests, the Kansas Act rests on, and is prompted by, significant and legitimate state interests.   Kansas has

---

clause under the old regulatory structure, ERG's prices ever would have reached the Act's levels.

[22] Many gas sale contracts contain similar provisions.   See 4 H. Williams, Oil and Gas Law § 734, pp. 800–801 (1981).   These stem from the assumption that the contracts are subject to governmental price and other regulation.   *Id.*, at 802.   Their purpose is to "provide that the contract shall continue in effect though modified to conform to the requirements of such law or regulation."   *Ibid.*

[23] A similar clause has been held implicitly not to incorporate state price regulations that impair interstate commerce.   See *Natural Gas Pipeline Co.* v. *Harrington*, 139 F. Supp. 452, 454–455 (ND Tex. 1956), vacated and remanded on other grounds, 246 F. 2d 915 (CA5 1957), cert. denied, 356 U. S. 957 (1958).   Analogously, state price regulations pre-empted by FPC price regulation have been held not to be incorporated by governmental price escalator clauses.   See *Pan American Petroleum Corp.* v. *Kansas-Nebraska Natural Gas Co.*, 297 F. 2d 561, 567–568 (CA8 1962).

exercised its police power to protect consumers from the escalation of natural gas prices caused by deregulation. The State reasonably could find that higher gas prices have caused and will cause hardship among those who use gas heat but must exist on limited fixed incomes.

The State also has a legitimate interest in correcting the imbalance between the interstate and intrastate markets by permitting intrastate prices to rise only to the § 109 level. By slowly deregulating interstate prices, the Act took the cap off intrastate prices as well.[24] The Kansas Act attempts to coordinate the intrastate and interstate prices by supplementing the federal Act's regulation of intrastate gas. Congress specifically contemplated such action:

> "The conference agreement provides that nothing in this Act shall affect the authority of any State to establish or enforce any maximum lawful price for sales of gas in intrastate commerce which does not exceed the applicable maximum lawful price, if any, under Title I of this Act. This authority extends to the operation of any indefinite price escalator clause." S. Conf. Rep. No. 95–1126, pp. 124–125 (1978); H. R. Conf. Rep. No. 95–1752, pp. 124–125 (1978).

There can be little doubt about the legitimate public purpose behind the Act.[25]

---

[24] Although the Act does place a ceiling on intrastate gas, it is the highest ceiling under the law, that is, the § 102 limit for newly discovered gas. Old interstate gas is subject to the much lower ceilings of § 104, or § 106 in the case of rollover contracts. In fact, the § 109 price for July 1982 of $2.194 per Mcf is substantially higher than any of the § 104 or § 106 prices for old interstate gas from wells drilled before 1974. See 47 Fed. Reg. 17981, 17982–17983 (1982). The Spivey-Grabs Field gas wells covered by these contracts were drilled between 1954 and 1961. Brief for Appellee 41, and n. 139 (citing Kansas Geological Society Library, Drillers' Log (Kansas producers)).

[25] ERG claims that the legislation was designed to benefit KPL. See n. 6, *supra*. Unlike *Allied Structural Steel Co.* v. *Spannaus*, 438 U. S. 234 (1978), there is little or nothing in the record here to support the con-

Nor are the means chosen to implement these purposes deficient, particularly in light of the deference to which the Kansas Legislature's judgment is entitled. On the surface, the State's Act seems limited to altering indefinite price escalation clauses of intrastate contracts that affect less than 10% of the natural gas consumed in Kansas. Tr. of Oral Arg. 16. To analyze properly the Kansas Act's effect, however, we must consider the entire state and federal gas price regulatory structure. Only natural gas subject to indefinite price escalator clauses poses the danger of rapidly increasing prices in Kansas. Gas under contracts with fixed escalator clauses and interstate gas purchased by the utilities subject to § 109 would not escalate as would intrastate gas subject to indefinite price escalator clauses. The Kansas Act simply brings the latter category into line with old interstate gas prices by limiting the operation of the indefinite price escalator clauses.

The Kansas Act also rationally exempts the types of new gas the production of which Congress sought to encourage through the higher § 102 prices. Finally, the Act is a temporary measure that expires when federal price regulation of certain categories of gas terminates. The Kansas statute

---

tention that the Kansas Act is special interest legislation. Given the nature of the industry—sales to public utilities—it is impossible for any regulation not to have a major effect on a small number of participants. This differs from the statute under challenge in *Allied Structural Steel Co.*, where a small number of employers were singled out from the larger group. The fact that there was a close vote at the committee stage, and that some of the committee dissenters expressed the view that the Kansas Act was special interest legislation, bears little if any resemblance to the circumstantial evidence present in *Allied Structural Steel Co.* Nor is there any indication that the Kansas political process had broken down. Cf. Note, 89 Yale L. J., at 1645 (provided "legislature is functioning properly, selection of a public purpose and determinations of necessity and appropriateness should be left to it"). In addition, the automatic price pass-through adjustment indicates that KPL will not benefit significantly from the statute. Although ERG is correct that the Commission could revoke the pass-through, it has given no indication that it will do so.

completes the regulation of the gas market by imposing gradual escalation mechanisms on the intrastate market, consistent with the new national policy toward gas regulation. We thus resolve the constitutional issue against ERG.

## III

We turn to ERG's statutory contention that the Kansas courts misconstrued § 105 as fixing the contract price at the November 9, 1978, level. While, on this point, the opinion of the Kansas Supreme Court is not entirely clear to us, it does not appear so to construe § 105. And KPL, in fact, does not contend that it did. Instead, the court recognized that § 105 permits the indefinite price escalator clauses to continue to operate to raise the contract price up to the lawful ceiling. See *Pennzoil Co.* v. *FERC*, 645 F. 2d 360, 379 (CA5 1981) ("[T]he NGPA does not preclude escalation of area rate clauses [a type of indefinite price escalators] to NGPA prices"), cert. denied, 454 U. S. 1142 (1982).

The actual point of dispute is whether the governmental price escalator clauses in these contracts were triggered by the enactment of § 105. The Kansas Supreme Court acknowledged that the Act could trigger a governmental price escalator clause. 230 Kan., at 184, 630 P. 2d, at 1149. In this case, however, it held that "[t]he NGPA did not trigger a price increase because the contracts herein did not contain a sufficient escalation mechanism." *Id.*, at 185, 630 P. 2d, at 1150. We agree that, as a matter of federal statutory interpretation, the Act does not trigger such clauses automatically. See 44 Fed. Reg. 16895, 16904 (1979).[26] Section 105(b)(1) provides that the ceiling price shall be the lower of

---

[26] On December 1, 1978, the Federal Energy Regulatory Commission issued interim regulations stating: "The establishment of maximum lawful prices under the NGPA shall not trigger indefinite price escalator clauses in existing intrastate or interstate contracts." 43 Fed. Reg. 56448, 56550 (1978). After a comment period, the FERC altered the regulation to reserve to state law the question whether such clauses operate in intrastate contracts. 44 Fed. Reg. 16895, 16904 (1979).

the § 102 price and "the price under the terms of the existing contract, to which such natural gas was subject on [November 9, 1978], as such contract was in effect on such date." By this language, Congress set a ceiling for the operation of contractual provisions; it did not prescribe a price:

"[T]he price under the contract may escalate through the operation of both fixed price escalator clauses and indefinite price escalator clauses in existence as of the date of enactment, but the price may not exceed the new gas price [provided by § 102].

.        .        .        .        .

". . . The conferees do not intend that the mere establishment of the ceiling prices under this Act shall trigger indefinite price escalator clauses in existing intrastate contracts." S. Conf. Rep. No. 95–1126, pp. 82–83 (1978); H. R. Conf. Rep. No. 95–1752, pp. 82–83 (1978).

See *Pennzoil Co.* v. *FERC*, 645 F. 2d, at 379.

The Kansas Supreme Court relied on its prior decision in *Mesa Petroleum Co.* v. *Kansas Power & Light Co.*, 229 Kan. 631, 629 P. 2d 190, clarified, 230 Kan. 166, 630 P. 2d 1129 (1981), cert. denied, 455 U. S. 928 (1982), which interpreted the effect of § 105 on a similar contract provision. In that decision, it read § 105 to set the lawful ceiling at the lower price provided by the contract. In light of our discussion above, we view this reading of the federal statute as unassailable. The Kansas Supreme Court's further holding in this case that these particular governmental price escalator clauses were insufficient to escalate the gas price is an interpretation of state law to which, of course, we defer.

## IV

The regulation of energy production and use is a matter of national concern. Congress set out on a new path with the Natural Gas Policy Act of 1978. In pursuing this path, Congress explicitly envisioned that the States would regulate in-

trastate markets in accordance with the overall national policy. The Kansas Natural Gas Price Protection Act is one State's effort to balance the need to provide incentives for the production of gas against the need to protect consumers from hardships brought on by deregulation of a traditionally regulated commodity. We see no constitutional or statutory infirmity in Kansas' attempt. The judgment of the Supreme Court of Kansas is therefore

*Affirmed.*

JUSTICE POWELL, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, concurring in part.

I concur in the judgment and all of the Court's opinion except Part II–C. The Court concludes in Part II–B that there has been no substantial impairment of ERG's contractual rights. The closing sentence states that "ERG's reasonable expectations have not been impaired by the Kansas Act." *Ante*, at 416. This conclusion is dispositive, and it is unnecessary for the Court to address the question of whether, if there were an impairment of contractual rights, it would constitute a violation of the Contract Clause. See *Allied Structural Steel Co.* v. *Spannaus*, 438 U. S. 234, 245 (1978).

The Court concludes in Part II–C that even if ERG's "contractual interests" were impaired, the Act furthers "significant and legitimate state interests" and is a valid exercise of the State's police power. *Ante*, at 416–419. I do not necessarily disagree with this conclusion, particularly in the context of the pervasive regulation of public utilities. I decline to join Part II–C, however, because it addresses a substantial question and our discussion of the separate issue in Part II–B disposes of this case.