### 24498

KEN MOORHEAD OIL CO., INC., Respondent v. FEDERATED MUTUAL INSURANCE COMPANY, Appellant v. SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL, Respondent.

(476 S.E. (2d) 481)

Supreme Court

*William W. Kehl, Bradford W. Wyche* and *Gregory J. En-*

*glish,* all of *Wyche Burgess Freeman & Parham, P.A.,* Greenville, *for Appellant.*

*Michael D. Glenn,* Anderson, *for Respondent Ken Moorhead Oil Co., Inc.*

*Jacquelyn S. Dickman, Elizabeth O. Levy* and *Carlisle Roberts, Jr.,* Columbia, *for Respondent South Carolina Department of Health and Environmental Control.*

Heard Oct. 18 , 1995.

Decided Sept. 23, 1996.

TOAL, Justice:

Federated Mutual Insurance Company ("Federated") challenges the circuit court's denial of its request for reimbursement from a state-created fund, the Superb Account, of amounts claimed by Federated's insured, Ken Moorhead Oil Co., Inc. ("Moorhead" or "Moorhead Oil"), under pollution liability policies issued in 1988 and 1989. Federated contends that the coordination of benefits clauses in its contracts with Moorhead Oil were a central feature of the insurance policies. Those clauses provided, in essence, that coverage under the insurance policies would be excess to any funds receivable from the Superb Account.

The circuit court ruled that certain statutes enacted in 1990 and 1992 deny Federated any right to Superb Account funds, notwithstanding Federated's payment of insurance funds to Moorhead Oil. Federated argues that the circuit court erred in failing to find the 1990 and 1992 Acts unconstitutional in that they impaired Federated's insurance policies with Moorhead Oil by requiring Superb Account funds to be excess to coverage under insurance policies. We find no violation of the state and federal Contract Clauses, and, accordingly, we affirm.

## FACTUAL BACKGROUND

Federated issues pollution liability policies throughout the United States. Moorhead Oil, which owns several sites containing underground petroleum storage tanks, purchased from Federated two pollution liability policies, the 1988 Policy and the 1989 Policy. The 1988 Policy remains relevant to this

lawsuit only to the extent it relates to certain subrogation issues.

The 1989 Policy, which was effective from July 16, 1989 until January 16, 1990, provided coverage in the amount of $500,000 per site with a $1,000,000 aggregate policy limit for leaks from Moorhead's underground petroleum storage tanks. The 1989 Policy contained an endorsement entitled "Coordination of Benefits with Governmental Funding Programs." The Coordination of Benefits Clause provided:

> As a condition for this insurance to apply, it is agreed that the insured shall:
>
> A. pay all fees, taxes, or premiums; and
>
> b. complete all required applications and registration forms; and
>
> c. comply with all laws, regulations or statutes
>
> in order to secure available funds from any governmental funding programs. Any failure or inability to secure funds from any program shall void this insurance to the extent that such funds would have applied to any loss covered under this insurance. If the inability to secure funds is directly due to the existence of this insurance, coverage shall also be void so as to permit contribution from any such governmental funding program.
>
> It is further agreed that any sum payable by a governmental funding program to the insured or on behalf of the insured shall reduce the Limits of Insurance shown in the Declarations by a corresponding amount if such payment would otherwise have been made under this insurance.
>
> We reserve the right to recover all or part of any payment made to the insured by a governmental funding program as reimbursement for losses incurred under this insurance

The South Carolina Department of Insurance approved the Coordination of Benefits form on October 18, 1988. As of the commencement of this lawsuit, this approval has never been challenged or withdrawn.

While the 1989 Policy was in effect, Moorhead Oil experienced leaking in some of its underground petroleum storage tanks. It reported the leaking and site contamination to the South Carolina Department of Health and Environmental

Control (DHEC) as required under the 1989 Policy and as a precondition to recovery of its clean-up expenses from a state-administered fund, the Superb Account.

When originally enacted in 1988, the South Carolina State Underground Petroleum Environmental Response Bank Act, S.C. Code Ann. §§ 44-2-10 *et seq.* ("the Superb Act"), created the Superb Account to fund the rehabilitation of sites having underground petroleum storage tanks. Before the 1990 and 1992 Amendments to the Superb Act, the Act provided a grace period during which an owner/operator of an underground petroleum storage tank could report site contamination. If the owner/operator reported the contamination within the grace period, he or she could receive funds from the Superb Account "without recourse to reimbursement or recovery." *See* Act 486 § 2, 1988 Statutes at Large 4073-74. If, however, the owner or operator reported the contamination after the grace period ended, he or she could receive only the lesser of "reasonable costs incurred in excess of one hundred thousand dollars or in excess of the amount recoverable from the financial responsibility mechanism provided for this purpose." *Id.* at 4074-75. Moorhead Oil reported the contamination during the grace period provided by the statute.

As administrator of the Superb Account, DHEC originally was averse to disbursing Superb Account funds to Moorhead Oil before Moorhead recovered from Federated. Eventually, however, DHEC decided to honor the Coordination of Benefits Clause.

Possibly as a response to the Coordination of Benefits Clause in the 1989 Policy, DHEC drafted amendments to the Superb Act. The General Assembly passed the first set of these amendments in 1990. A 1990 amendment to S.C. Code Ann. § 44-2-70(A) provides in pertinent part that:

> No insurance policy, guarantee, surety bond, or any other financial responsibility mechanism which is executed to provide this or additional amounts of coverage shall contain any terms, endorsements, conditions, provisions, or other language that requires expenditure of funds from the Superb Account prior to or in lieu of payment by the mechanism.

Act 473 § 3, 1990 Statutes at Large 2134-35. Another 1990

amendment to S.C. Code Ann. § 44-3-130(A) provides in relevant part as follows:

> If a liability insurance policy or any other financial responsibility mechanism which provides coverage for sudden or nonsudden release of petroleum or petroleum products from an underground storage tank has been executed for a site at which reimbursement or direct billing from the Superb Account is sought, no funds may be expended from the Superb Account until the funds provided by the financial responsibility mechanism have been exhausted.

Act 473 § 7, 1990 Statutes at Large 2137-38. These amendments are hereinafter referred to as the 1990 Amendments.

In 1992, DHEC drafted, and the General Assembly adopted, an additional amendment to the Superb Act. That amendment provides in relevant part:

> [N]o such financial responsibility mechanism which has previously been executed shall operate so as to require the expenditure of funds from the Superb Account or Superb Financial Responsibility Fund until funds provided by the financial responsibility mechanisms have been exhausted.

Act 501 § 43, 1992 Statutes at Large 3318 ("the 1992 Amendment").

## PROCEDURAL BACKGROUND

Moorhead Oil brought this action against Federated seeking, *inter alia*, payment under the 1988 and 1989 Policies. In turn, Federated brought a third-party complaint against DHEC, seeking declarations that (1) the Superb Account provided for *primary* reimbursement of Moorhead Oil's sites, and (2) Federated was entitled to subrogation rights against the Superb Account. The claims between Moorhead Oil and Federated have since settled.

The gist of Federated's argument below was that the law at the time Moorhead reported the contaminated sites allowed payment from the Superb Account without regard to insurance and that, therefore, Federated was entitled to enforce the Coordination of Benefits Clause as well as certain provisions allowing subrogation. Federated claimed that if applied

retroactively, the 1990 and 1992 Amendments would effect an unconstitutional impairment of the 1989 Policy.

The circuit court disagreed, finding both that the amendments applied retroactively and that such retroactive application was constitutional. Federated appeals this ruling.

## LAW/ANALYSIS

As an initial matter, it is important to clarify the current posture of this case. Federated has already paid Moorhead, and Moorhead and Federated have settled all claims between them. Therefore, all Federated now seeks is a declaration that it is subrogated to Moorhead's right to recover from the Superb Account. However, Federated's right to subrogation, if any, depends in part on the resolution of its claim under the Contract Clauses of the federal and state constitutions. If this Court finds that the retroactive application of the Superb Act Amendments is constitutional, then Federated's alleged right to subrogation is meaningless, because Moorhead will he entitled to reimbursement from the Superb Account only in excess of its coverage under the Federated policies. Because of the interplay between the constitutional issues and the subrogation right, we address the constitutional issues first.

### A. *Impairment of Contract/Contract Clause*

Federated argues the Superb Act Amendments unconstitutionally impair its contracts with Moorhead Oil. We disagree.

### 1. Introduction

Both the United States Constitution and the South Carolina Constitution bar the state from passing laws that impair the obligations of contracts. *See* U.S. Const. art. I, § 10; S.C. Const. art. I, § 4. In interpreting the Contract Clause of the South Carolina Constitution, this Court has followed federal precedent construing the federal Contract Clause. *G-H Ins. Agency v. Continental Ins. Co.*, 278 S.C. 241, 246, 294 S.E. (2d) 336, 339 (1982) ("The mandate of the state and federal constitutions relating to impairment of contracts is basically the same.").

The United States Supreme Court has formulated a three-step inquiry for determining whether a law violates the federal Contract Clause. As a threshold matter, the law being challenged must actually impair the contract at issue. *United*

*States Trust Co. v. New Jersey*, 431 U.S. 1, 17, 97 S.Ct. 1505, 1515, 52 L.Ed. (2d) 92, 106 (1977). Second, the impairment must be substantial. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed. (2d) 727, 736 (1978). Finally, unless a law that substantially impairs a contractual obligation is "reasonable and necessary to carry out a legitimate governmental purpose," the law violates the contract Clause. *Citizens for Lee County v. Lee County*, 308 S.C. 23, 30, 416 S.E. (2d) 641, 646 (1992); *accord Baltimore Teachers Union v. Mayor of Baltimore*, 6 F. (3d) 1012, 1018 (4th Cir. 1993), *cert. denied*, 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed. (2d) 435 (1994).

### 2. Impairment

The circuit court and both the parties acknowledge that the Superb Act Amendments impair the 1989 Policy. The questions remain, however, whether the impairment is (1) substantial and (2) unreasonable and unnecessary under the circumstances.

### 3. Substantiality of Impairment

Even if we assume an impairment of the 1989 Policy, that impairment is not substantial. In determining the extent of impairment to a contract, one must "consider whether the industry the complaining party has entered has been regulated in the past." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed. (2d) 569, 580 (1983). For example, in *Energy Reserves Group*, the parties entered into two contracts for the intrastate sale of natural gas. The contracts each contained a governmental price escalator clause providing that "if a governmental authority fixes a price for any natural gas that is higher than the price specified in the contract, the contract price shall be increased to that level." *Id.* at 403-04, 103 S.Ct. at 700, 74 L.Ed. (2d) at 575-76.

Sometime after the parties entered the contract, but while the contract was still in effect, the United States Congress passed the Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3301 *et seq.* Unlike the previous federal Natural Gas Act, the 1978 Act extended federal price regulation of natural gas to the intrastate market and set certain rules establishing price ceiling for the intrastate market. The Act also permitted states "to

establish or enforce any maximum lawful price for the first sale of natural gas produced in such State which does not exceed the applicable maximum lawful price, if any, under title I of [the] Act." 15 U.S.C. § 3432(a). In response to the federal Act, the Kansas Legislature passed an act forbidding, *inter alia*, consideration of ceiling prices set by federal authorities in the application of governmental price escalator clauses. *See* Kan. Stat. Ann. § 55-1404 (Supp. 1982).

Energy Reserves Group ("ERG") brought an action in which it alleged the Kansas statute violated the Contract Clause by interfering with ERG's preexisting contract with Kansas Power & Light. Both the Kansas Supreme Court and the United States Supreme Court upheld the Kansas statute. The United States Supreme Court reasoned that Kansas's supervision of the natural gas industry was "extensive and intrusive," and that "[p]rice regulation existed and was foreseeable as the type of law that would alter contract obligations." *Energy Reserves Group,* 459 U.S. at 414, 416, 103 S.Ct. at 706-07, 74 L.Ed. (2d) at 582, 584. Given the history of regulation and the foreseeability of further regulation, the Supreme Court found no substantial impairment to the contract. *Id.* at 416, 103 S.Ct. at 707, 74 L.Ed. (2d) at 584.

Similarly, the arena in which Federated chose to do business is highly regulated. Federated argues that it is regulated by the Department of Insurance, which approved the Coordination of Benefits form. Federated suggests, in essence, that because the Department of Insurance regulates insurers, the Court must find a substantial impairment if the law or regulation at issue came from anyone other than the Department of Insurance.

This argument ignores the fact that Federated does business in *two* highly regulated fields—those of insurance and environmental cleanup. The state created the Superb Account to assist owners and operators of underground petroleum storage tanks in cleaning up petroleum leaks, and it possesses the power to place conditions upon participation by owners and operators. A condition requiring an owner or operator to exhaust any financial responsibility mechanism before being entitled to funds from the Superb Account was entirely foreseeable. Federated had no right to rely on the law remaining unchanged in this area, given the high degree of state regulation

over environmental issues, as well as South Carolina's interest as a sovereign in administering a state-created fund. Accordingly, any impairment to the 1989 Policy was insubstantial.

There is an additional, more basic reason the contractual impairment at issue here was insubstantial. For purposes of Contract Clause analysis, a statute can be said to substantially impair a contract when it alters the reasonable expectations of the contracting parties. *See, e.g., Energy Reserves Group*, 459 U.S. at 411, 103 S.Ct. at 704, 74 L.Ed. (2d) at 580 ("Total destruction of contractual expectations is not necessary for a finding of substantial impairment. On the other hand, state regulation that restricts a party to gains it reasonable expected from the contract does not necessarily constitute a substantial impairment."); *United States Trust Co.*, 431 U.S. at 19-20 n. 17, 97 S.Ct. at 1516-17 n. 17, 52 L.Ed. (2d) at 108 n. 17 (referring to impairment as an interference with the "legitimate expectations of the contracting parties"). Here, in order to prevail, Federated would have to show that it had a reasonable expectation that the state would continue its policy of distributing funds from the Superb Account without regard to insurance policies held by owners or operators of underground petroleum storage tanks.

Federated had no such reasonable expectation. The only way in which Federated could have had such a reasonable expectation is if it had some contractual relationship with the state wherein the state obligated itself to distribute funds in a certain way for Federated's benefit. It is true that the language of the 1992 Amendment refers to the operation of insurance policy clauses like the Coordination of Benefits Clause in the 1989 Policy. Nevertheless, the 1992 Amendment, along with the 1990 Amendments, embody a policy decision concerning how funds in the Superb Account should be disbursed. The amendments do not constitute an attempt by the state to bind itself to act in any particular way that might further Federated's pecuniary interests. Federated cannot dictate through its private contracts how a state-administered fund must be disbursed, which, as we view it, is what Federated attempted to do through its Coordination of Benefits clause.[1]

---

[1] Taken to its logical extreme, Federated's argument amounts to an insistence that once the state makes a decision as a sovereign about how to appropriate funds, private parties can bind the state perpetually to a certain course

Generally, a private party can require a state to spend its funds in some particular way only when the state has entered into a contract with that private party. *See, e.g., Baltimore Teachers Union v. Mayor of Baltimore*, 6 F. (3d) 1012 (city entered into contract to pay salaries of city's schoolteachers and police officers). Moreover, statutes can create such contractual obligations. *See, e.g. United States Trust Co.*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed. (2d) 92 (New Jersey statute created contract between State of New Jersey and certain bondholders). If a state retroactively repeals such a statute, then a party to that statutory contract may well have a cause of action under the Contract Clause.

Here, however, Federated does not argue that the Superb Act created a contract with *anyone* concerning the expenditure of the funds in the Superb Account. Moreover, if the Superb Act created a contract with anyone, it was with the owners and operators of underground petroleum storage tanks, not insurance companies. Furthermore, there is no possible construction of the Superb Act that would make insurance companies third-party beneficiaries of a statutory contract between South Carolina and owner/operators of underground petroleum storage tanks. In the absence of any such contractual relationship with the State of South Carolina, Federated has *no* enforceable interest in how the funds in the Superb Account are disbursed.

Put another way, in the absence of any contract with Federated concerning the expenditure of funds from the Superb Account, the State of South Carolina is perfectly free to change its mind about how the Superb Account should be administered. Such an action is well within the parameters of the state's police power. "The States must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result." *United States Trust Co.*, 431 U.S. at 22, 97 S.Ct. at 1517, 52 L.Ed. (2d) at 109. If Federated's contractual expectations were destroyed by the 1990 Amendments and the 1992 Amendment, such destruction of expectations is attributable not to unconstitutional action by South Carolina, but to Fed-

---

of action simply by entering a private contract concerning use of those public funds.

erated's entirely unreasonable expectations. Because neither Federated nor Moorhead Oil had any reasonable expectations that South Carolina would continue to pay monies from the Superb Account without regard to insurance, there was not substantial impairment of the contract at issue here.

### 4. Reasonableness and Necessity

Given our conclusion that there is no substantial impairment to the 1989 Policy, analysis of the third prong of the Contract Clause test is not necessary. Nevertheless, in light of the potential federal court review of our constitutional holdings, we reach the issue briefly.

For a law to survive scrutiny under the Contract Clause when the law substantially impairs a contract, it must be "reasonable and necessary to accomplish a legitimate public purpose." *Citizens for Lee County*, 308 S.C. at 30, 416 S.E. (2d) at 646; *accord Baltimore Teachers Union*, 6 F. (3d) at 1018. When a state acts to impair a purely private contract, "courts properly defer to legislative judgments as to the necessity and reasonableness of a particular measure." *United States Trust Co.*, 431 U.S. at 23, 97 S.Ct. at 1518, 52 L.Ed. (2d) at 110. However, when the state impairs a contract to which it is a party, less deference is due the legislative judgment concerning reasonableness and necessity, because the state's self-interest is implicated. *E.g., Spannaus*, 438 U.S. at 244, 98 S.Ct. at 2722, 57 L.Ed. (2d) at 736.

Federated argues that the court should pay little deference to any legislative judgments of necessity and reasonableness in this case, because the state's self-interest is implicated, even though the contract at issue is purely a private contract. We disagree, finding Federated's construction of the term "self-interest" contrary to precedent and logic.

Although the United States Supreme Court has said that heightened scrutiny is appropriate when a state' self-interest is at stake, it has found that a state's self-interest is at stake when the state is a party to the contract that has been impaired. For example, in *United States Trust Company*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed. (2d) 92, the State of New Jersey violated the Contract Clause when it impaired a contract it had entered with certain bondholders.

If we accepted Federated's broad construction of the term "self-interest," virtually every state statute that impairs a purely private contract would be subject to heightened scrutiny. Presumably, every state statute is intended to serve South Carolina's self-interest; otherwise, the General Assembly would not enact the legislation in the first place. The self-interest that is a factor in all legislation, however, is unlike the self-interest the Supreme Court was referring to in *United States Trust Company*. "Self-interest," as the United States Supreme Court viewed it, refers to the state's interest as a *party to a contract*, rather than to its interests as a *sovereign* seeking to further important public policies. Thus, when a state is a party to a contract it seeks to impair by subsequent legislation, heightened scrutiny is appropriate. Conversely, where legislation impairs a private contract, the court generally must defer to legislative judgements regarding reasonableness and necessity.

In this case, the state is not a party to a contract with Federated. Instead, the state allegedly has impaired a contract between two private parties, so we must pay considerable deference to legislative judgment concerning the reasonableness and necessity of the law that effects the impairment.

Traditional analysis of reasonableness and necessity focuses on such issues as (1) whether an emergency exists justifying the impairment; (2) whether the law was enacted to protect a basic societal interest, rather than a favored group; (3) whether the law is narrowly tailored to the emergency at hand; (4) whether the imposed conditions are reasonable; and (5) whether the law is limited to the duration of the emergency. *See, e.g., Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed. (2d) 727; *G-H Ins. Agency*, 278 S.C. 241, 294 S.E. (2d) 336. Of course, there need not be an emergency situation before a state may pass a law impairing a private contract. *See Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed. (2d) 727.

There is no indication in the Record that an emergency situation exists, so factors (1), (3), and (5), listed above, do not apply. In our view, however, factors (2) and (4) have been satisfied, and the 1990 Amendments and the 1992 Amendment represent a reasonable decision by the General Assembly about how best to preserve the funds in the Superb Account. The originally stated purpose of the Superb Act was

to "strengthen the regulatory control of underground storage tanks and to establish a separate account to serve as a depository for funds which will enable DHEC to respond without delay . . . in order to protect the public health, safety, welfare, and minimize environmental damage." 1988 Act No. 486 § 1(B). The protection of public health and the environment serves broad societal interests, not merely some "favored" special interest group.[2] Furthermore, a condition requiring owners and operators to exhaust their insurance before seeking funds from the Superb Account is reasonably related to the legitimate governmental purpose of protecting the environment and preserving public health.

This case differs dramatically from *Garris v. Hanover Insurance Co.*, 630 F. (2d) 1001 (4th Cir. 1980), and *G-H Insurance Agency v. Continental Insurance Co.*, 278 S.C. 241, 294 S.E. (2d) 336 (1982). Both those cases concerned a Contract Clause challenge to a state statute that created a cause of action in insurance agents for wrongful termination of their agency relationships with insurance companies. The statute creating the cause of action constituted part of a larger statutory scheme that had as its purpose "to make compulsory automobile liability insurance available on a nondiscriminatory basis to all drivers licensed by the state." *Garris*, 630 F. (2d) at 1010.

The Fourth Circuit rejected the contention that this purpose underlay the specific statute creating a cause of action for wrongful termination of an agency relationship. It also found that other sections of the larger statutory scheme guaranteed achievement of the public purpose and that, therefore, the statute at issue was not "necessary" to the accomplishment of the public purpose asserted. *Id.* It was apparent to that court that statutory provisions protecting insurance agents have, at best, an attenuated connection to a legislative goal of assuring the availability of liability insurance to all state-licensed drivers.

---

[2] We disagree with Federated's contention that the Superb Act's original purpose does not apply to the 1990 Amendments and the 1992 Amendment. Even assuming the amendments were drafted to "fix" the problem with Federated's Coordination of Benefits clause, the most plausible reason for the "fix" was to preserve the Superb Account funds in order to provide better protection for public health and the environment.

In contrast, the connection between the Superb Act Amendments and the preservation of the Superb Account (and, by extension, the protection of public health and the environment) is obvious. If the state has to disburse monies from the Superb Account before insurers must pay out their policies, the potential for rapid depletion of the Superb Account is greatly increased, which, in turn, increases the risk that funds will not be available for major accidents. The legislative judgment here was entirely reasonable and requires our deference.

## B. *Subrogation*

Even assuming a violation of the state and federal Contract Clauses, Federated has no right to be subrogated to Moorhead's rights to recover from the Superb Account.

Any right to recover from the Superb Account belongs to *Moorhead* rather than to Federated. Federated acknowledges this, but claims that under the 1988 and 1989 Policies, it has the right to step into Moorhead's shoes and recover whatever Moorhead would nave been entitled to from the Superb Account. This argument ignores the state's right to determine to whom Superb Account funds should be paid. Both as it existed in 1989 and as it now exists, the statute does not provide that anyone may be subrogated to the right of an owner/operator to collect from the Superb Account. In the absence of a statutorily created right to participate in the Superb Account as a subrogee, Federated may not create the right itself. *Cf.* S.C. Code Ann. § 42-5-210 (1985) (allowing workers' compensation insurance carrier to be subrogated to the rights of the employer).

## CONCLUSION

For the foregoing reasons, the decision of the circuit court is AFFIRMED.

FINNEY, C.J., and MOORE, WALLER and BURNETT, JJ., concur.