**HIGHLAND CHATEAU, INC., Appellant,**

v.

**MINNESOTA DEPARTMENT OF PUBLIC WELFARE, et al., Respondent.**

**No. C3–84–549.**

Court of Appeals of Minnesota.

Oct. 30, 1984.

K. Craig Wildfang, Wildfang, Rude, McIntosh, Murray, Chartered, Minneapolis, Sidney P. Abramson, Robins, Zelle, Larson & Kaplan, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Brad P. Engdahl, Sp. Asst. Atty. Gen., St. Paul, John L. Kirwin, St. Paul, for respondent.

Theodore J. Collins, Timothy J. Eiden, Collins, Buckley, Sauntry & Haugh, St. Paul, amici curiae (representing 17 Highland residents/aligned with Highland).

Tonja M. Orr, Kathleen M. Davis, Legal Aid Society of Minneapolis, Minneapolis, amicus curiae (Nursing Home Residents Council/aligned with DPW).

Heard, considered, and decided by LANSING, P.J., and WOZNIAK and FORSBERG, JJ.

## OPINION

WOZNIAK, Judge.

Highland Chateau appeals from the January 20, 1984, entry of an adverse summary judgment. Highland challenged DPW's interpretation and enforcement of Minn. Stat. § 256B.48, subd. 1(a), the "rate equalization law." Further, it contended that DPW's application of the statute was unconstitutional as violative of the supremacy clause, the obligation of contracts clause, and the due process and equal protection clauses of the U.S. Constitution. We affirm.

## FACTS

Minn.Stat. § 256B.48, subd. 1(a) (Supp. 1983), the equalization law, provides in pertinent part:

A nursing home is not eligible to receive medical assistance payments unless it refrains from:

(a) Charging private paying residents rates for similar services which exceed those which are approved by the state agency for medical assistance recipients as determined by the prospective desk audit rate, except under the following circumstances: The nursing home may (1) charge private paying residents a higher rate for a private room, and (2) charge for special services which are not included in the daily rate if medical assistance residents are charged separately at the same rate for the same services in addition to the daily rate paid by the commissioner.

This statute was originally enacted by the legislature in 1976. Although amended in 1983, its original purpose remains: to require nursing home operators who partic-

ipate in the medical assistance ("MA") program to charge private residents a rate which does not exceed the rate the state allows for medical assistance residents.

MA is a program cooperatively funded and administered by the state and federal governments for the purpose of reimbursing certain costs of medical care for needy persons. The program is governed by both federal law (42 U.S.C. § 1396 et seq. and 42 C.F.R. parts 40–456) and state law (Minn. Stat. § 256B.01 et seq. (1982)).

Over 97% of Minnesota's 440 nursing homes participate in the medical assistance program. Typically, the homes house both private patients (those who pay with personal or insurance funds) and MA patients (those whose cost is borne by the state).

Plaintiff/appellant Highland Chateau is a 111-bed nursing home located in Ramsey County, Minnesota. Although all 111 beds at Highland are certified for participation in the MA program, historically over 85% of its residents have been private pay patients.

Defendants/respondents, the Department of Public Welfare and its commissioner, are charged with interpretation and enforcement of the rate equalization law.

On May 24, 1983, Highland asked DPW's approval for creation of what in essence would be two separate nursing homes within its building. The first would consist of 67 beds and would house private pay patients only. The second would consist of 44 beds and would house both private pay and welfare patients. Highland sought to accomplish this by "decertifying" the 67-bed unit from the MA program, and seeking MA certification only for the 44-bed unit. This latter unit would be physically segregated from the 100% private pay unit, but in the same building.

Under this arrangement, Highland believed that it could comply with the rate equalization law by equalizing rates only within the certified portion of the home, while charging any rate it wished to the private pay patients in the decertified portion.

DPW rejected Highland's proposal, saying "certifying only part of the facility does not negate the effect of the law, which addresses nursing homes rather than parts of nursing homes."

Following DPW's rejection of its proposal for partial decertification, Highland initiated this action challenging DPW's implementation of the law. Shortly after the complaint was filed, the parties agreed to a temporary injunction. DPW agreed to continue to reimburse Highland for its MA residents; Highland agreed to hold its request for decertification in abeyance and to refrain from transferring MA residents to a special section of the home.

On August 22, 1983, DPW moved for summary judgment on all counts of Highland's complaint. After a hearing and the submission of post-hearing briefs by the parties and amicus, the district court granted DPW's motion, and summary judgment in favor of DPW was entered on January 20, 1984.

On appeal, Highland contends that there are material facts in dispute, and thus, DPW was not entitled to judgment as a matter of law, asserting all of the legal theories raised in its complaint.

## ISSUES

I. Are there material facts in dispute?

II. Was DPW entitled to judgment as a matter of law?

   A. Has DPW correctly interpreted and applied the rate equalization law?

   B. Is the rate equalization law as applied consistent with federal law?

   C. Is the rate equalization law as applied consistent with the requirements of the equal protection clause?

   D. Is DPW's interpretation of the rate equalization law consistent with the due process clause?

   E. Are the interpretation and application of the rate equalization law consistent with the requirements of the

impairment of contracts clause of the Federal Constitution?

## ANALYSIS

### Standard of Review

Rule 56 provides in pertinent part that summary judgment shall be rendered when:

The pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to judgment as a matter of law.

Minn.R.Civ.P. 56.03.

■■■ A genuine issue of fact is one which is not a sham or frivolous. *A & J Builders, Inc. v. Harms,* 288 Minn. 124, 179 N.W.2d 98 (1970). A material fact is one whose resolution will affect the result or outcome of the case. *Zappa v. Fahey,* 310 Minn. 555, 245 N.W.2d 258 (1976).

### I. Are there material facts in dispute?

■ Highland claims five genuine issues of material fact are present in this case: Whether DPW's interpretation of the rate equalization law (1) is erroneous; (2) is preempted by federal law; (3) violates due process guaranties; (4) violates equal protection guaranties; and (5) impermissibly impairs the obligations of contract.

These "facts" are merely restatements of the five ultimate legal issues in this case. Such legal disputes do not preclude the award of summary judgment.

We hold there are no material facts in dispute.

### II. Was DPW entitled to judgment as a matter of law?

■ A. Is DPW's interpretation and application of the rate equalization law erroneous?

The trial court agreed with DPW's contention that the rate equalization law must be applied to a nursing home in its entirety. Nursing home is defined as "a facility licensed under Chapter 144A or a boarding care facility licensed under sections 144.50 to 144.56." Minn.Stat.Ann. § 256B.421, subd. 7 (Supp.1983). Thus, DPW contends, under the statute, the critical inquiry is whether the facility is *licensed* as a nursing home. Whether all or part of the facility is certified is irrelevant.

Highland argues that the law should be applied only to a portion of a home which is certified to receive MA payments, rather than the entire home. Essentially, Highland seeks to create two nursing facilities under one roof: one facility certified to house MA recipients in which private paying residents pay rates equal to the welfare rate; and a second, uncertified facility housing only private residents, paying whatever rate the market will bear.

"The object of all interpretation and construction of laws is to ascertain and effectuate the intentions of the legislature." Minn.Stat. § 645.16 (1982). Thus, we must examine the societal purposes served by the rate equalization law. By enacting Minn.Stat. § 256B.48, the legislature intended to enhance the greater public welfare.

In upholding the rate equalization law in an earlier constitutional and statutory challenge waged by the nursing home industry, the Federal District Court in Minnesota discussed some of the societal purposes served by the rate equalization law.

The equalization provision: (1) may reduce discrimination against Medicaid recipients in gaining entry to nursing homes by eliminating the incentive to discriminate; (2) tends to alleviate the "stigma" attached to receiving welfare benefits; (3) permits private pay residents to stretch their savings farther and thereby stay off welfare; (4) promotes the fundamental notion of fairness that one should pay equal rates for equal services; and (5) eases the resentment of private pay patients directed toward Medicaid recipients.

*Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dept. of Public Welfare,* No. Civ. 3–77–467 and No. 3–78–

88, slip op. at 15, —— F.Supp. ——, —— (D.Minn. April 26, 1983) (Minn.Health I).

In light of these purposes, the trial court in the present case concluded not only that Highland's interpretation of the equalization law is inconsistent with the language used by the legislature, but that it is at odds with the legislature's intended social purposes as well:

> If Highland's interpretation of the law were to prevail, the Equalization Law might well become meaningless. Every nursing home in Minnesota could easily avoid the requirements of the law by decertifying as much of the nursing home as possible, while leaving enough beds certified to accommodate the facility's MA residents. Nursing home residents would be segregated into two groups, the private-pay residents and the medical assistance residents. To say that no one would know which resident was in which group is unrealistic .... Obviously, in enacting the legislation, the legislature had in mind a social purpose that cannot be ignored.
> DPW's interpretation is not only consistent with the language of the statute, but it also furthers the social purposes intended by the legislature when the statute was enacted.

We agree.

Highland further contends that the rate equalization law should not apply to the noncertified part of its nursing home because that part of the facility does not provide "similar services" within the meaning of the statute, but instead provides "different more extensive services."

This new contention runs contrary to the argument Highland made to the trial court. As the order noted, Highland's own affidavits establish that the services offered in the noncertified part of the facility will be the same as those offered in the certified part. If, however, what Highland claims on appeal is accurate, and "different more extensive services" will indeed be provided in the noncertified portion of the nursing home, then by this very action it will be violating the rate equalization law. The statute requires that special services must be available to both MA and private patients if they are made available to any patients at all.

Finally, Highland argues "that even if a private paying resident needs more care, and desires more care, and can pay for more care, it is prohibited under DPW's interpretation" of the rate equalization law.

These assertions are clearly incorrect. The rate equalization law expressly allows a nursing home to separately "charge [private paying residents] for special services which are not included in the daily rate if medical assistance residents are charged separately for the same services in addition to the daily rate paid by the commissioner." Minn.Stat. § 256B.48, subd. 1(a). Clearly, any special services a private pay patient desires must be offered to him, conditioned of course on such services being offered to medical assistance residents on the same basis. Therefore, the rate equalization law will not prevent a private patient from receiving services in addition to those included in the basic MA rate. If he can pay for extra services, he is entitled to receive them. Additionally, there appears to be some disagreement on the meaning of "special services." This is broad terminology and should be given broad interpretation.

We hold that DPW's interpretation and application of the rate equalization law is correct.

B. Does the equalization law as applied conflict with federal law?

The federal Medicaid Act permits the certification of a "distinct part" of a nursing home. Highland argues that DPW's policy of applying the state equalization law to the entire nursing home, even the noncertified portion, is at odds with the federal law, in violation of the supremacy clause of the U.S. Constitution.

The Minnesota Supreme Court has stated a three-part preemption analysis:

> (1) whether compliance with the federal and state provisions is a physical impossibility;

(2) whether preemption is express and unequivocal in the language of the federal statute; and

(3) whether congressional preemptive intent is implicit in the overall scheme of federal and state regulation.

*State v. First Nat'l Bank of St. Paul*, 313 N.W.2d 390, 392 (Minn.1981), *appeal dismissed*, 456 U.S. 967, 102 S.Ct. 2226, 72 L.Ed.2d 840 (1982).

■ We hold the equalization law is not preempted by the federal Medicaid Act, 42 U.S.C. § 1396.

First, compliance with the federal and state provisions is not physically impossible. Highland could partially certify its home in accordance with federal law, and at the same time charge equal rates throughout the entire home in accordance with state law.

Second, Congress has not "unmistakenly ordained" that states may not require equalization of rates within an entire facility even though the facility is only partially certified for participation in the Medicaid program.

Third, preemptive intent is not implicit in the scheme of federal and state regulation. The Medicaid Act is a cooperative federal-state funded program.

Finally, the rate equalization law may well further purposes of the federal legislation in that the cost of services of individuals covered by the program will not be borne by individuals not covered, and MA recipients will generally have the same access to covered services as the general population.

The equalization law does not contravene federal law and is valid under the supremacy clause of the U.S. Constitution.

C. Does the equalization law, as applied, violate equal protection?

Highland suggests that DPW's enforcement of the rate equalization law violates equal protection on two grounds. First, that the nursing home would be treated differently from other similarly situated homes. Second, that certain nursing home residents themselves would be treated disparately.

■ An economic or social welfare classification such as the rate equalization law will not be set aside under the equal protection clause unless it is shown to have no rational or reasonable basis. *Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979).

Highland's first argument, that a nursing home with side-by-side facilities could achieve partial certification under the rate equalization law while Highland cannot, is less than persuasive.

■ Highland's second argument, however, that DPW's enforcement of the law subjects nursing home residents to disparate treatment, merits a closer look.

The equalization law became effective July 1, 1978. Concerned about the possibility of patients being uprooted if the law was implemented quickly, DPW granted certain exceptions which effectively allowed for delayed implementation.

Under this "phase-in" program, DPW simply continued to reimburse noncomplying homes for their residents admitted before the equalization law took effect. For those admitted after, DPW granted individual "waivers."

As of July 1, 1983, for a myriad of rational reasons, DPW stopped granting waivers.

Highland argues that the discontinuance of the waiver policy violates the equal protection rights of private pay residents who may become eligible for Medicaid in the future. This argument is without merit.

First, the constitutionality of the equalization law already has been upheld. *Minn. Health I.* Second, the legislature added a treble damages enforcement remedy to the equalization law, thereby strengthening its commitment to the law. Finally, it had become apparent to DPW that waivers were preventing the equalization law from taking effect.

In light of these factors, DPW's decision to prospectively discontinue its waiver policy does not constitute an arbitrary or irra-

tional exercise of its discretion in violation of the equal protection rights of Highland residents.

■ D. Does DPW's implementation of the equalization law constitute a taking of property without due process?

Highland contends DPW's proposed implementation of the rate equalization law deprives Highland of substantive due process and results in a "taking" of its property without just compensation in violation of the Fourteenth Amendment.

In fact, medical assistance participation is voluntary, so that there can be no due process violation:

> Participation by a nursing home as a provider of health care services to Medicaid recipients is voluntary. If appellants [representatives of the Minnesota nursing home industry] find that the reimbursement rates are insufficient, then they may either make their homes more efficient and economical or terminate their relationship with Medicaid and no longer accept medicaid recipients.

*Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dept. of Pub. Welfare,* 602 F.2d 150 (8th Cir.1979) (Minn.Health II). *See also, Minn. Health I.*

Finally, Highland contends that business realities prevent nursing homes from leaving the Medicaid program voluntarily. Despite the strong financial inducement to participate in Medicaid, a nursing home's decision to do so is nonetheless voluntary. This voluntariness forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation.

E. Does DPW's interpretation and application of the rate equalization law violate the contract clause?

Highland contends that, by making compliance with its terms a condition of Medicaid participation, Section 256B.48, subd. 1(a) impairs the obligation of contracts in violation of Article I, section 10, of the United States Constitution. Specifically, Highland argues that its contracts with its

private pay patients are impaired by DPW's refusal to allow Highland to certify only a portion of its facility.

Highland has contractual commitments to continue to care for residents after two years as private paying patients, even if the resident's funds are depleted and the residents become eligible for medical assistance.

The gist of their argument is that, since the rate equalization law, as applied by DPW, will make it cost-prohibitive for them to keep any MA patients at all in the home, Highland will be forced to breach the contracts it has made with its private pay patients.

■ The test to determine whether a law has unconstitutionally impaired a contract is:

> (1) whether the impairment is substantial, including whether the challenged regulation was within reasonable expectations;
>
> (2) whether the challenged regulation promotes a significant and legitimate public purpose; and
>
> (3) whether the regulation is a reasonable exercise of the State's police power.

*See Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983).

■ The Eighth Circuit Court of Appeals has already applied this test to Section 256B.48, subd. 1(a) and concluded that those provisions of the statute which have prospective application are constitutional:

> Initially, we doubt that the law causes a substantial impairment of contractual relationships. Nursing homes could not reasonably expect that the terms of whatever contracts they had with their residents would exempt them from rate regulation by the state. Even if the impairment is substantial, however, the state's interest in controlling rates charged by nursing homes provides a legitimate public purpose for the statute. Without the statute, nursing homes could charge residents not receiving medical assistance higher rates in order to com-

pensate for what they consider to be inadequate Medicaid reimbursement. In view of the state's objective of providing adequate compensation to prudently managed nursing homes, *see Minnesota Rules, supra,* § 9510.0020, the legislature could prohibit nursing homes from making unsubsidized residents bear the burden of inefficient nursing home operation. Legitimate exercise of the police power includes ensuring that state efforts to assist some nursing home residents do not work to the detriment of other residents. In addition, the class of persons benefitted by the statute is certainly not so narrow that it may be deemed special interest legislation. The statute truly deals with an important general social problem and serves to protect a basic interest of society. Finally, particularly in view of the gradual implementation of the rate limitations, we cannot say that the adjustment of contract rights effected by the statute involves unreasonable conditions or is inappropriate to the public purpose it serves.

*Minn. Health I,* slip at 14.

Therefore, Highland's complaint that DPW's application of the rate equalization law impairs the obligations of contracts between Highland and its residents does not rise to the level of being unconstitutionally violative of the contract clause of the U.S. Constitution.

## DECISION

Because there was no dispute of material fact and DPW was entitled to judgment as a matter of law, summary judgment was properly granted.

Affirmed.