Dear Sirs:
This office is in receipt of your requests for an opinion relative to the effect on the St. Bernard Parish Water and Sewer Commission (the "Commission") of the adoption of a Home Rule Charter for St. Bernard Parish (the "Parish"). This response answers each of your requests, which contain the same questions.
The undersigned was advised that the Commission was originally created as a Joint Commission pursuant to R.S.33:1321-1337 and an Intergovernmental Agreement dated November 13, 1985. The Intergovernmental Agreement is between Water Districts No. 1 and 2, Sewerage Districts No. 1 and 2 and the Parish of St. Bernard. All four districts are still in existence and all, except Water District No. 2, have outstanding tax millages and general obligation bonds. Subsequent thereto, the creation of the Commission was ratified by the Louisiana Legislature in Act No. 377 of 1986 (the "Act"), which enacted R.S. 33:7801 through 7811.
R.S. 33:7807 states that the "Commission shall constitute an instrumentality of the state of Louisiana as a body politic and political subdivision thereof . . ." R.S. 33:7810 further provides that the Commission shall exist and continue to exist for a period of the later of 99 years from November 13, 1985 or until all of its contractual obligations have been performed and all debt securities issued by it are fully paid.
The Commission issued and delivered $10,650,000 of Water and Sewer Revenue Bonds, Series 1986 (the "1986 Bonds"). The Commission also issued and delivered $1,350,000 of Water and Sewer Revenue Bonds, Series 1991 (the "1991 Bonds"). In connection with the issuance of the 1986 and the 1991 Bonds, the Commission covenanted to maintain rates and charges of the water and sewer services provided by the Commission at a level necessary (i) to pay the expenses of operating and maintaining the system and (ii) to provide an additional amount equal to at least 1.25 times the combined debt service on the 1986 Bonds and the 1991 Bonds (the "Rate Covenant").
In November of 1988, the voters of St. Bernard Parish approved a Home Rule Charter (the "Charter") which became effective in January, 1992. The Charter refers to the water and sewer districts in two places, but does not mention the Commission itself. Section 4.05 states that the director of public works is responsible for the operation of the parish water and sewerage districts and Section 7-09(D) of the Charter states:
 "The council and the president shall effect an orderly transition of administration and operations of all water and sewerage districts into the new plan of government to insure uninterrupted service to the parish. If special legislation is required to effect this transition, the council will so initiate." (Emphasis added)
The questions presented are as follows:
 1. Did the adoption of the Home Rule Charter automatically invalidate the provisions of Act No. 377 of 1986?
 2. If the Act is invalid, did the adoption of the Home Rule Charter also invalidate the provisions of the Intergovernmental Agreement creating the Commission? Would this be a violation of the Contract Clause contained in Article I, Section 10 of the United States Constitution?
 3. Did the Commission cease to exist by virtue of the adoption of the Charter, or do (i) Article VI, Section 16(A) and (B) of the Louisiana Constitution of 1974 and (ii) Section 7-09(B) and (C) of the Charter require that a separate election be held on the consolidation of the Commission and the Districts (except for Water District No. 2, which has no outstanding bonds) before the consolidation can take place? In other words, did the adoption of the Charter constitute an implied approval of the proposed consolidation and merger, or is another election necessary to comply with the provisions of Article VI, Section 16 of the Louisiana Constitution?
 4. Can the Parish comply with the Rate Covenant under the terms of Section 2-17(D) of the Charter? If it cannot comply with the Rate Covenant, then would the consolidation be an impairment of the Commission's contract with its bondholders under Article I, Section 10 of the United States Constitution? Prior to effecting the consolidation, should Section 2-17(D) be amended to specifically allow the adjustment of rates and charges which might be pledged to secure water and sewer revenue bonds without the necessity of holding an election first?
Attorney General Opinion No. 90-606 concluded that the adoption of the home rule charter made repeal of the special legislation creating the Commission unnecessary, provided however, before the Commission's operations can be transferred to the parish government, the parish must insure the performance of the obligation of the Commission's contracts and retirement of all debt securities incurred by the Commission.
Opinion No. 90-606 was based, at least in part, upon Opinion No. 80-912, which dealt with the City of Monroe Utilities Commission and the facts in the two opinion requests are dissimilar. In the prior opinion (No. 80-912), the City of Monroe had adopted a home rule charter which purported to transfer the operations of the City's electric and water utilities to a new Department of Public Works and the question was whether it was necessary for the legislative act creating the Utilities Commission to be repealed prior to said transfer. Act 256 of 1956 created the Utilities Commission "as a part of the City Government of the City of Monroe" and not as a separate political subdivision of the State. Ownership of the utilities was vested in the City and the members of the Utilities Commission were appointed by the City Council. Furthermore, the Utilities Commission was required to make monthly financial reports to the City and any excess revenues generated by the Utilities Commission reverted to the City's General Fund. Bonds issued for utility purposes were issued in the name of the City of Monroe. The Utilities Commission was a part of the government of the City of Monroe and its creation by a local act was properly superseded by the adoption of a home rule charter providing for a different method of administration of the utilities system.
The facts surrounding the Monroe Utilities Commission opinion are quite different from the facts regarding the Commission, which (i) is a separate political subdivision of the State, (ii) owns its water and sewer systems in addition to having control of the administration and management of the systems, (iii) levies taxes and issues bonds in its own name and not in the name of the Parish, (iv) has no financial reporting requirements to the Parish, other than to obtain approval of the Parish Council of bond issues and tax elections, and (v) is not tied in any way to the financial operations of the Parish.
As stated above, the conclusion of Opinion No. 90-606 was not that the Commission automatically ceased to exist by virtue of the adoption of the Home Rule Charter, but rather that the Charter and the Act provided a framework for the transition after certain other steps had been taken. Although Opinion No. 90-606 does not specifically address all of the steps to be taken prior to effecting the consolidation and merger of the Commission, it is clear that both Article VI, Section 16 of the Louisiana Constitution of 1974 and Section 7-09 of the Parish's Charter require that an election be held on the question of the consolidation, merger and assumption of debt.
Article VI, Section 16 of the Louisiana Constitution provides as follows:
 "(A) A local governmental subdivision may consolidate and merge into itself any special district or local public agency, except a school district, situated and having jurisdiction entirely within the boundaries of the local governmental subdivision. Upon the consolidation and merger, the local governmental subdivision shall succeed to and be vested with all of the rights, revenues, resources, jurisdiction, authority, and powers of the special district or local public agency. A consolidation and merger shall become effective only if approved by a majority of the electors voting thereon in the local governmental subdivision as a whole and by a majority of the electors voting thereon in the affected special district. A local public agency shall be consolidated and merged only if approved by a majority of the electors voting thereon in an election held for that purpose in the local governmental subdivision in which the agency is located.
 (B) If the special district or local public agency which is consolidated and merged has outstanding indebtedness, the authority provided by this Section shall not be exercised unless provision is made for the assumption of the indebtedness by the governing authority of the local governmental subdivision involved." (Emphasis added)
Section 7-09(B) and (C) of the Charter virtually restate the provisions of Article VI, Section 16.
The question arises as to whether a local governmental subdivision has the authority to merge and consolidate an entity created or given political subdivision status by the state. This was specifically considered by the redactors to the constitution in the following comments, where the "next section" being referred to is the language that became Article VI, Section 16 of the Constitution:
"Mr. Lanier Right.
 The next section deals with districts that are not created by the local governmental authority. This provision is intended to those that are created under, and by virtue of, the authority of the local governmental unit. Most of your general laws dealing with this subject are passed by the legislature authorizing the creation of all of these multi-types of districts under the general umbrella of the local governmental authority.
 The other section you are referring to are districts that are not created under the umbrella of the local governmental authority, but are independently created by the state." (Emphasis added)
Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, Volume VII, 59th Days Proceedings — September 28, 1973, p. 1502
 "Mrs. Zervigon Madam Acting Chairman and delegates, I mostly want to point out to you the distinction between this section and the previous section just adopted. The previous section had to do with control over agencies created by a local governing authority. Section 18 [now 16] applies to agencies not created by a local governing authority. How can a local governing authority consolidate agencies totally within its borders, if it were not created by them? This is mostly to take care of the problems which reside primarily in Jefferson and Orleans of constitutional drainage districts and that sort of thing. They will be able to be merged only upon a favorable vote of a majority of the electors voting on the question. We figured that with an agency not created by the governing authority there ought to be one additional safeguard before any merger or consolidation would take place." (Emphasis added)
Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, Volume VII, 59th Days Proceedings — September 28, 1973, p. 1506
The election at which the Charter was approved was not an election on the question of the consolidation of the Commission, but was rather on the adoption of the Charter and the approval of its specific terms. The Charter does not mention the Commission, nor does it directly address the question of the consolidation of the Commission and the assumption of its bonded indebtedness. While it may be possible that an election to approve a home rule charter could include the issues of merger and consolidation and assumption of debt, those issues were not before the voters in this instance.
Furthermore, discussions in the Charter generally of "boards and commissions" cannot be construed to provide authority for the consolidation and merger of existing special districts or local public agencies under Article VI, Section 16 or Section 7-09 of the Charter. Section 9-05(A) provides that all existing boards or commissions "falling under the authority of the police jury" continue in existence and are subject to the provisions of Section 7-07 dealing with advisory boards. Section 9-05(C) further provides that existing boards or committees not re-established under Section 7-07 within one year of the seating of a new council shall be automatically dissolved. Section 7-07 indicates that advisory boards and commissions are to provide advice "regarding the operations of parish services or other activities. No such board or commission shall exercise any administrative or legislative responsibility". Since the Commission and the individual districts exercise administrative and legislative responsibility, it cannot be argued that the Commission and the individual districts fall within those boards and commissions governed by Section 9-05 and Section 7-07 of the Charter.
Based upon the foregoing, it is the opinion of this office that the adoption of the Charter did not automatically invalidate the provisions of R.S. 33:7801-7811. It is further the opinion of this office that the Commission did not cease to exist by virtue of the adoption of the Charter and that in order to merge and consolidate the Commission into the Parish, it will be necessary to hold an election for that purpose in accordance with Article VI, Section 16 of the Louisiana Constitution and Section 7-09 of the Charter. If the voters approve the consolidation and the assumption or other repayment of the Commission's debt, and the Parish ensures the performance of the obligation of the Commission's contracts, no specific repeal of the Act would be necessary; however, then and only then, could the "orderly transition of administration and operations" of the Commission, as called for in Section 7-09(D) of the Charter, be completed.
Based upon the finding that the Act is not invalid, it is unnecessary to address the issue of the status of the Intergovernmental Agreement.
The final question pertains to the provisions of the Rate Covenants and Section 2-17(D) of the Charter.
Section 2-17(D) of the Charter requires an election prior to adoption of all proposals to "levy a new or increase an existing sales and use tax, charge, or fee". As stated earlier, the 1986 Bonds and the 1991 Bonds contain Rate Covenants requiring that the Commission maintain rates and charges for water and sewer services at a level sufficient to (i) pay the expenses of operating and maintaining the system, and (ii) provide an additional amount equal to at least 1.25 times the combined debt service on the 1986 and 1991 Bonds.
We note that Section 9-01 of the Charter, governing certain transitional provisions, provides in pertinent part as follows:
 "(A) All . . . contracts, franchises, debt or other obligations due by St. Bernard Parish, . . . shall continue unaffected. . . ."
 "(B) All actions, ordinances, and administrative rules and regulations of St. Bernard Parish . . . insofar as they are not inconsistent with this charter, remain in full force and effect. . . ." (Emphasis added)
Section 9-03(C) provides as follows:
 "(C) All fees, charges, and taxes levied by St. Bernard Parish shall continue to be levied by the parish government until changed by the council by ordinance or by a vote of the people when a vote is required." (Emphasis added)
These provisions bind the parish government to those obligations of St. Bernard Parish that were previously in place, and allow the parish government to continue to collect the fees, charges and taxes levied by St. Bernard Parish prior to the effective date of the new form of government. However, obligations of and rates and charges levied by the Commission, a separate political subdivision, would not be covered by these transitional provisions. Should the Parish assume the outstanding indebtedness of the Commission, it appears that the parish government could not legally carry out the Rate Covenant of the Commission without reference to Section 2-17(D) of the Charter.
Your question is whether Section 2-17(D) of the Charter should be amended to except adjustments to water and sewer rates and charges required by the Rate Covenant in order to allow the Parish to undertake to perform the Commission's obligations under the two bond issues?
The Contracts Clause of the United States Constitution, Art. I, Sec. 10[1], and of the Louisiana Constitution, Art. I., Sec. 23, prohibit the enactment of a law impairing the obligation of contracts. In Board of Commissioners of the Orleans Levee District v. Department of Natural Resources,496 So.2d 281 (La. 1986), our Supreme Court relied on the United States Supreme Court decision in Energy Reserves Group, Inc. v. Kansas Power Light, 459 U.S. 400, 103 S.Ct. 697,74 L.Ed.2d 569 (1983) to set forth the "appropriate Contract Clause standard". While the language of the Contract Clause is facially absolute "its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people".
The threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual obligation. If an impairment is found, the next determination is whether the impairment is of a constitutional dimension. Total destruction of contractual expectations is not necessary for a finding of substantial impairment. However, a state regulation that restricts a party to the gains it reasonably expected from the contract does not necessarily constitute a substantive impairment.
If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation. The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests.
Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of the contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. In making the analysis, a central concern to the courts has been to protect legitimate contract-based expectations from government interference. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts. Into all contracts there enters the condition that the state may not bargain away or otherwise be prevented from exercising its police power, viz., the exercise of the sovereign right of the government to protect the lives, health, morals, comfort and general welfare of the people. Consequently, when legislation modifies or abrogates contracts already in effect, the crucial question is whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end.
Based upon the foregoing, it is the opinion of this office that the requirement of holding an election in order to increase the sewer and water rates to the amount necessary to comply with the provisions of the bond documents would be a substantial impairment of the contractual arrangement with the bond holders. It is further the opinion of this office that such an impairment could be found by a court of law to be in violation of the Contract Clauses of the Louisiana and United States Constitutions.
Thus it would be appropriate for the Parish to except adjustments to water and sewer rates and charges required by the existing Rate Covenants from the referendum provisions of Section 2-17(D) of the Charter in the event that the Parish assumes the Commission's outstanding debt. If the Parish so chose, it could retain the requirement that an election be held to increase fees and charges which are not the security for an existing bond issue or for a prospective bond issue; however, the Parish may desire to discuss with bond counsel whether or not such a provision would affect the marketability of future bond issues.
Trusting this adequately responds to your request, I remain
Yours very truly,
 RICHARD P. IEYOUB Attorney General
 BY: MARTHA S. HESS Assistant Attorney General
RPI:JMZ:jav 2933m